[Civ. No. 28420. Fourth Dist., Div. One. May 27, 1983.]

CALIFORNIA ASSOCIATION OF DISPENSING OPTICIANS et al.,
Plaintiffs and Respondents, v.
PEARLE VISION CENTER, INC., et al., Defendants and Appellants;
BOARD OF OPTOMETRY, Intervener and Respondent.

COUNSEL

Sidley & Austin, Charles S. Vogel, Kenneth K. Howell and George L. Saunders for Defendants and Appellants.

Athearn, Chandler & Hoffman, Richard Harrington, Donald H. Maffly, Walter Hoffman, Gary Shapiro, Wilke, Fleury, Hoffelt & Gray, William A. Gould, Jr., Alan G. Perkins, Bradley N. Webb and Robert N. Mirkin for Plaintiffs and Respondents.

George Deukmejian, Attorney General, and Alvin J. Korobkin, Deputy Attorney General, for Intervener and Respondent.

OPINION

**STANIFORTH, J.**—Plaintiffs California Association of Dispensing Opticians (CADO) et al., sought to enjoin defendants Pearle Vision Center, Inc. (Pearle) et al., from violating California statutes regulating the practice of dispensing opticians, optometrists and optical suppliers. The California State Board of Optometry (Board) intervened as a plaintiff in CADO's lawsuit. A temporary restraining order was issued enjoining Pearle from operating several retail optician outlets without a license, engaging in certain types of advertising and con-

tinuing solicitation of optometrists to purchase retail optometric franchises. After a contested hearing a preliminary injunction was granted enjoining Pearle:

"a. From engaging in business as a dispensing optician at Carlsbad Plaza, 2588 El Camino Real, Carlsbad, California, 573 H Street, Chula Vista, California, 2770 Town Center, Sunnyvale, California, or at any other location within the State of California without first obtaining a certificate or registration issued by the Board of Medical Quality Assurance pursuant to the provisions of Business & Professions Code Section 2551;

"b. From disseminating or causing to be made or disseminated in any type of advertising statements stating or implying that defendants or any one of them is performing or authorized to perform the acts of a dispensing optician except at a location which has been registered as a dispensing optician by the Board of Medical Quality Assurance;

"c. From disseminating or causing to be made or disseminated in any type of advertising statements stating or implying that defendants or any one of them is furnishing the services of a refractionist or optometrist or is directly or indirectly employing or maintaining on or near defendants' optical dispensing premises a refractionist or optometrist for the purpose of examining or treating the eyes; this paragraph prohibits advertisements stating or implying that defendants furnish total eye care."

The preliminary injunction was conditioned upon the posting of a bond. Pearle sought a writ of supersedeas and prohibition from this court. After a review of the supersedeas documents and petition this court summarily denied the petition. Pearle appeals the order granting the preliminary injunction.

FACTS

CADO is a nonprofit corporation whose members are licensed by the State of California as registered dispensing opticians. Coplaintiff Pacific Coast Contact Lens Society is a nonprofit corporation composed of opticians who specialize in fitting contact lenses. Individual plaintiff Richard H. Kendall, O.D., is a licensed optometrist practicing in Orange County, California. The Board is a state body charged with regulating the optometry profession under state law. Pearle consists of G. D. Searle, Inc., a large manufacturer of pharmaceuticals and ophthalmic goods through its wholly owned subsidiary, Searle Optical Company, Inc., and Pearle Vision Centers, Inc., which operates a chain of retail ophthalmic dispensing outlets, Pearle Vision Centers, in several states.

Optometrists in California are licensed and regulated by the Board. Optometry is regarded as a learned profession. To become licensed as an optometrist an individual must have at least three years of undergraduate education in a scientific field and four years of optometry school culminating in a doctor of optometry degree. Upon admission to practice optometrists are allowed to correct refractive errors and to detect eye disease. Most optometrists also dispense ophthalmic products consisting of eye glasses and contact lenses.

In contrast, a registered dispensing optician is licensed by the Division of Allied Health Professions of the Board of Medical Quality Assurance. Dispensing opticians fill prescriptions for glasses or contact lenses from optometrists and ophthalmologists (physicians or surgeons who specialize in eye care and treatment). Dispensing opticians do not examine eyes and dispense ophthalmic goods only on prescription.

The complaint sought injunctive relief alleging six causes of action[1] which assert both generally and specifically the illegality of Pearle's operation as registered opticians and its proposed franchise program. From the verified complaint and the declarations filed by the various parties as submitted to the trial court, it appears Pearle was engaged as a dispensing optician at three locations in California and was not licensed at these locations.[2] Pearle's program sought to have optometrists purchase franchises from Pearle.

Pearle's advertising represented Pearle provided "total eye care," implying it furnished eye examinations. Expert witness Dr. Takahashi testified "*total eye care*" means "[t]he full range of professional optometric services" and a dispensing optician cannot under his license furnish "total eye care." Concerning an ad stating "Nobody cares for eyes more than Pearle" Daniel Kelly testified the advertisement shows Pearle was advertising optometric services.

---

[1] The first cause of action charged defendants with practicing as a dispensing optician at three unlicensed locations in violation of Business and Professions Code section 2551; conduct was also charged as unfair competition and deceptive and misleading advertising in violation of section 17200 and 17500. Injunctive relief was sought pursuant to sections 17203, 17204, 17535. The second cause of action alleged a violation of section 2556 advertising services of an optometrist and furnishing service of an optometrist on or near Pearle's optical dispensing premises. The third cause of action charged Pearle with violation of sections 655, 17200, 17203 and 17204 by engaging as a dispensing optician in a landlord tenant relationship with an optometrist where patients and customers are referred between the two. The fourth cause of action is identical with the third except it charged a violation of section 655. The fifth cause of action charges Pearle with the practice of maintaining optometrists adjacent to their dispensing premises in violation of various Business and Professions Code sections. Finally the sixth cause of action charges Pearle by virtue of control exercised over optometrists with violating sections 3040, 3070 and others.

[2] This court is informed these violations have been corrected during the pendency of this appeal.

Competent evidence also was offered in support of the injunction against soliciting California optometrists to operate a Pearle Vision Center franchise. Pearle's franchise-offering circular detailed the provisions of the proposed franchise agreement between the franchisor Pearle and the franchisee optometrists.

The trial court also had before it the Attorney General's opinion the franchising optometric offices by this arrangement constituted an unlawful practice of optometry. (65 Ops.Cal.Atty.Gen. 366 (June 10, 1982).) Pearle contends trial court error in granting the preliminary injunction because (1) it was based on a misinterpretation of the relevant portions of the Business and Professions Code, (2) the interpretation of the statute was unconstitutional, and (3) the proper procedural prerequisites in ruling on the preliminary injunction were not followed.

DISCUSSION

I

As a general rule the granting or denying of a preliminary injunction, even though the evidence may be conflicting, rests within the sound discretion of the trial court and may not be disturbed on appeal except for an abuse of discretion. (*People* v. *Mobile Magic Sales, Inc.* (1979) 96 Cal.App.3d 1 [157 Cal.Rptr. 749]; *Volpicelli* v. *Jared Sydney Torrance Memorial Hosp.* (1980) 109 Cal.App.3d 242, 248 [167 Cal.Rptr. 610].) Furthermore, a preliminary injunction does not reach the merits of the permanent injunctive relief sought in the complaint.

This court briefly set forth the dispositive rules for issuance of a preliminary injunction in *People* v. *Mobile Magic Sales, Inc., supra,* 96 Cal.App.3d 1, 8: " ' "The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." [Citations.] The general purpose of such an injunction is the preservation of the status quo until a final determination of the merits of the action. [Citations.] Thus, the court examines all of the material before it in order to consider "whether a greater injury will result to the defendant from granting the injunction than to the plaintiff from refusing it; . . ." [Citations.] In making that determination the court will consider the probability of the plaintiff's ultimately prevailing in the case and, it has been said, will deny a preliminary injunction unless there is a reasonable probability that plaintiff will be successful in the assertion of his rights. [Citations.] As was said in *Family Record Plan, Inc.* v. *Mitchell* . . . "In the last analysis the trial court must determine which party is the more likely to be injured by the exercise of

its discretion [citation] and it must then be exercised in favor of that party [citation]." ' [Citation.]"

## II

Pearle preliminarily argues the trial court erroneously ruled as a matter of law—whether from statutory or constitutional premises—that Pearle's franchise program and advertising violated California statutes. Pearle contends (and this court agrees) when the matter is solely a question of a violation of law the standard of review is not abuse of discretion but whether statutory or constitutional law was correctly interpreted and applied by the trial court. (See *State Bd. of Funeral Directors* v. *Mortuary in Westminster Memorial Park* (1969) 271 Cal.App.2d 638, 642 [76 Cal.Rptr. 832]; *Johnson* v. *County of Santa Clara* (1973) 31 Cal.App.3d 26, 31 [106 Cal.Rptr. 862].) CADO submitted no evidence other than Pearle's franchise agreement and advertising and argued these documents on their face clearly demonstrated statutory violations. This uncontested evidence raises only a question of law for this court's determination. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *People* v. *Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 304, 309 [151 Cal.Rptr. 757].)

## III

Pearle argues this court must reverse the preliminary injunction unless it concludes Pearle's franchise agreement and advertising not only violates the California statutes but that the injunction itself does not offend the federal Constitution commerce clause, the First Amendment or the supremacy clause. We first examine the issue of violation of state laws.

CADO specifically contends Pearle's franchising program constitutes control over the "practice of optometry" as that term is used in Business and Professions Code sections 3041 and 3070. In contrast Pearle argues selling eyeglasses and contact lenses (dispensing function) is not properly considered part of the professional practice of optometry.

 While an *optometrist*·under the umbrella of his right to practice optometry may engage in retail sales of eyeglasses and contact lenses, the reverse is not equally true; the eye wear retailer is not allowed to engage in the practice of optometry. To the medical judgments required of the optometrist under Business and Professions Code section 3041, subdivision (d),[3] must be added the authority of the optometrists to dispense eyewear under section 3042

---

[3]All statutory references are to the Business and Professions Code unless otherwise specified.

authorizing optometrists to fill prescriptions and section 2543 authorizing optometrists "to dispense, sell or furnish prescription lenses at retail." The statutory authorization for an optometrist to dispense eyewear in conjunction with the optometry practice should not be construed as a grant of authority to an unlicensed person to engage in the practice of optometry in conjunction with the sale of eyewear.

■ The trial court's conclusion Pearle's franchise program is illegal rests upon the fundamental premise that California has a strong long-standing public policy against permitting lay persons to practice any of the medical arts or to exercise control over decisions made by healing art practitioners. (*Painless Parker* v. *Board of Dental Exam.* (1932) 216 Cal. 285, 296 [14 P.2d 67].) The trial court had before it uncontradicted evidence of such control. From the face of the franchising agreement it is clear Pearle had the power to control many facets of the optometrist's practice of optometry. For example, with respect to real property arrangements, Pearle must approve the site of the optometrist's office. If the franchisee is purchasing an existing site from Pearle, he must also purchase all improvements. If he wishes to obtain a new site, Pearle must approve all proposed leasehold improvements, furnishings, fixtures, inventory and supplies which are obtained from anyone other than Pearle.

Pearle also exercises a variety of controls over financial aspects of a franchisee's practice. According to the circular a franchisor may "finance" franchisees, and the franchisee must pay a substantial percentage of his gross income to the franchisor as both a "franchise fee" and as an advertising contribution. Franchisees must utilize the Pearle "system" relative to operating the practice and must use the franchisor's design specifications for offices. Furthermore, the franchisee is subject to periodic audits by the franchisor. Substantial penalties can be assessed if the audit is unfavorable to the franchisee.

A separate and distinct specie of control lies in the franchisor's control over a variety of treatment decisions to be made by the optometrist. A franchisee is required to stock all of Pearle's approved frame lines, to carry an inventory of prescription lenses and other optical goods and supplies approved by Pearle. Pearle has sole discretion to modify frame lines, and specifications for optical goods. Finally, the franchisee's choice of laboratory is limited to those approved by Pearle.

Reservation of this authority over an optometrist by a nonhealing arts practitioner is against public policy and clearly illegal. Franchising of this sort is unacceptable in the opinion of the Attorney General: "[T]he profession of optometry is not amenable to being conducted through the franchised operations described herein which postulate the exercise of the substantial control by a franchisor over the professional services of the franchisee. For such an op-

tometric franchise to operate under California law, the franchisor would have to be registered with the Board of Optometry as a licensed optometrist or licensed professional optometric corporation . . . ." (65 Ops.Cal.Atty.Gen., *supra,* 366, 372.)

Sections 3070, 3103 prohibit corporate employment of optometrists. Section 655[4] prohibits a host of affiliations between optometrists and others. These statutes clearly establish the legislative intent to prevent lay control of optometrists. This legislative policy is further implemented by section 1514 of title 16 of the California Administrative Code, which regulates leases by optometrists from mercantile establishments. The latter regulation requires every phase of an optometrist's practice be under his or her exclusive control (§ 1514, subd. (a)) and advertisements must not link the optometrist's name with that of the mercantile establishment (§ 1514, subd. (e)). This regulation reflects a determination by the Board of Optometry that such relationships are against the public interest. The Board is charged with enforcing these laws. Its interpretations are entitled to great weight and should be followed unless clearly erroneous. (*Judson Steel Corp.* v. *Workers Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564]; *Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; *Westfall* v. *Swoap* (1976) 58 Cal.App.3d 109, 114 [129 Cal.Rptr. 750].)

IV

■ The franchise agreement violates other provisions of California law when it proposes to advertise the franchise business under the name "Pearle Vision Center." The name of the optometrist-franchisee is required to be substantially associated with the name and service marks of the franchisor. The "Pearle Vision Centers" name is required on buildings, literature and advertisements. By such advertisement Pearle holds itself out as an optometrist in violation of sections 3040, 3127 and 3128. (See Ops.Cal.Atty.Gen., *supra,* 366, 369.)

The franchise program also would violate section 3125. Section 3125 and its companion regulation prohibit an optometrist from using any fictitious or assumed name unless the Board has issued a written authorization. Before a fic-

---

[4]Section 655 (in effect during this proceeding) prohibited any "membership, propriety interest, coownership, landlord-tenant relationship, or any profit sharing arrangement in any form, directly or indirectly, either by stock ownership, interlocking directors, trusteeship, mortgage, trust deed, or otherwise" between optometrist and various persons. Under subdivision (a) such relationships are illegal between optometrists and opticians when referrals of patients are made between the two. Under subdivision (b) these relationships are prohibited between optometrists and persons engaged in the manufacture, sale, or distribution of lenses, frames, optical supplies, etc. (§ 655 was amended eff. Jan. 1, 1983.)

titious name will be approved the regulation requires (1) the applicant's practice be wholly owned and entirely controlled by the applicant, (2) the proposed name not be deceptive or inimical to enabling the consumer to make a rational choice, and (3) the names of all optometrists practicing at the location must be displayed in a conspicuous place and in any advertising. Section 3125, subdivision (b) also requires the fictitious business name contain either the word "optometry" or "optometric."

The franchise agreement requires the franchisee to operate under a name which could not be approved by the Board. Furthermore, the franchise agreement does not allow the use of either "optometry" or "optometric." Finally, the use of the name "Pearle Vision Centers" on all of the franchise locations within a particular geographic location would necessarily confuse the consuming public and lead the public to believe the franchises were controlled by the same entity and not by the individual optometrists.

## V

The franchise agreement requires the optometrist remit a percentage of the income received. In so doing, this agreement violates section 655 (*ante*, fn. 4) which prohibits profit-sharing and co-ownership arrangements between an optometrist and a lay person. Section 655 is the basic legislative declaration against control by nonoptometrists over any facet of the practice of optometry.

The fact that section 655 enumerates some forbidden relationships does not preclude, under the *exclusio unus* rule, a finding the statute also applies to other unacceptable relationships between optometrists and optical suppliers. The wording of the statute itself rules out this limiting doctrine for it includes the more inclusive terms such as "in any form directly or indirectly" and "or otherwise" before each subsection. Thus the statute by its own context indicates the relationships listed in the statute are meant to be examples rather than an exhaustive listing of all those prohibited relationships. (*People* v. *Richards* (1927) 86 Cal.App. 86, 89-90 [260 P. 582].)

The franchise agreement violates section 655 in its revenue division requirements. According to paragraph 7.3 of the agreement the franchisee is required to pay Pearle 8½ percent of the franchisee's monthly gross revenues. This arrangement requires an apportionment between the franchisee and franchisor of the financial return or gain and thus constitutes a profit-sharing arrangement prohibited by section 655.

These requirements constitute a profit-sharing arrangement between an optometrist and his supplier. Pearle claims section 655 cannot possibly apply to its

arrangement because one accepted meaning of "profit sharing" refers to net income. While the term may be understood to mean a net return or net after-tax income, there is no reason apparent in the statute why it should be limited to this meaning. The plain intent of the statute is to preclude a fund-sharing relationship between an optometrist and a supplier. Thus the term "profit sharing" can properly encompass a sharing of income, gross or net. That is what is called for precisely by the franchise agreement.

Finally, the franchise agreement violates 655 because it contemplates a species of co-ownership. The optometrist may be the recipient of loans from Pearle subject, however, to Pearle's security interest. In light of the franchise requirement to stock approved Pearle frame lines and other materials, this could be joint ownership in violation of section 655.

## VI

Pearle next contends the California regulatory statutes violate the federal Constitution. ■ Legislative acts are presumed constitutional and the burden of establishing unconstitutionality is upon the challenging party. (*Simac Design, Inc.* v. *Alciati* (1979) 92 Cal.App.3d 146, 155 [154 Cal.Rptr. 676].)

■ In civil cases constitutional questions should be raised at the trial court level or considered waived. (See *Hershey* v. *Reclamation District No. 108* (1927) 200 Cal. 550, 564 [254 P. 542]; *Geftakys* v. *State Personnel Board* (1982) 138 Cal.App.3d 844, 864 [188 Cal.Rptr. 305].) Furthermore the record on appeal is not adequate to conduct a review of the claimed constitutional error.

## VII

■ Without fact or case authority, Pearle avers the statutes in question violate the federal Sherman Anti-Trust Act. Pearle does not explain how these statutes affect in any way the flow of services or material to California or in any way have a disparate impact upon out-of-state firms.

The statutes enforced by the trial court constitute direct regulations of professions by the State of California and are expressly exempt from operation of the Sherman Act. In *Parker* v. *Brown* (1942) 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307], the Supreme Court upheld a marketing program adopted for the 1940 raisin crop under the California Agricultural Prorate Act against a claim that it violated the Sherman Act. The holding in *Parker* v. *Brown* should be contrasted with *Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773, 790 [44 L.Ed.2d 572, 587, 95 S.Ct. 2004] where the Supreme Court struck down a fee schedule

adopted by a voluntary county bar association. The Supreme Court noted the threshold inquiry is whether an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe. The litmus test is "whether the activity is required by the State acting as sovereign." (*Goldfarb*, at p. 790 [44 L.Ed.2d at p. 587].) The Supreme Court held the questioned conduct was not required sovereign state action, since the State of Virginia did not require the anticompetitive activities of the state bar or county bar through either its Supreme Court rules or any Virginia statute. Regulation of the profession was left to the Virginia Supreme Court which mentioned advisory fee schedules in its ethical codes but did not direct either the state bar or the county bar to supply them or adhere to them.

It was insufficient in *Goldfarb* to argue the anticompetitive conduct is "prompted" by state action. Rather, the anticompetitive activity must be "*compelled* by direction of the State acting as sovereign." (*Id.,* at p. 791 [44 L.Ed.2d at p. 587]; italics added.) The Virginia State Bar voluntarily joined in what was essentially a private anticompetitive activity and in that posture could not claim it was beyond the reach of the Sherman Act. (*Id.,* at pp. 791-792 [44 L.Ed.2d at p. 587].)

*Goldfarb* must also be contrasted with *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691], where the Supreme Court upheld the validity of regulations restricting advertising by attorneys. The court noted the challenged restraint was an affirmative command of the Arizona Supreme Court which wielded the state's power over the practice of law. Therefore, the restraint was compelled by direction of the state acting as sovereign and complied with the state action requirements of *Goldfarb*. (*Id.,* at p. 360 [53 L.Ed.2d at p. 821, 97 S.Ct. at p. 2697].) In sum where the programs involve restraints on competition, they will be upheld if they follow a clearly articulated and affirmatively expressed state policy and the state plays an active role in the execution of the program. (*New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.* (1978) 439 U.S. 96 [58 L.Ed.2d 361, 99 S.Ct. 403].) We conclude the statutes and regulations here are activities required by the state acting in its sovereign capacity. They are beyond the reach of the Sherman antitrust laws.

## VIII

 Pearle does not show how the commerce clause of the United States Constitution (art. I, § 8, cl. 3) has been violated by the particular restrictions placed upon activities of optometrists or lay people who would seek to "franchise" with optometrists. The guidelines for determining the applicability of the commerce clause have been summarized by Professor Lawrence H. Tribe of Harvard University: "Since the mid-1930s, the Supreme Court has sought to

clarify the process by which it determines whether state regulation is prohibited by the Commerce Clause. The distinction between 'direct' and 'indirect' burdens has been rejected as overly conclusory and misleadingly precise. In its place, the court has substituted the following, more openly indeterminate, principle: State regulation affecting interstate commerce will be upheld if (a) the regulation is rationally related to a legitimate state end and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation." (Tribe, American Constitutional Law (1978) § 6-5, p. 326.)

The statutes regulating the practice of a profession such as optometry come within traditional concepts of the police power to regulate. In *Head* v. *New Mexico Board* (1963) 374 U.S. 424 [10 L.Ed.2d 983, 83 S.Ct. 1759], the United States Supreme Court upheld a restriction on advertising because it fell within the state's police power even though it had an effect on interstate commerce, since it did not discriminate against interstate commerce. Thus, a facially neutral statute regulating the profession of optometry was held not to violate the commerce clause even though it might impinge upon interstate commerce in a particular instance. (*Id.,* at pp. 427-428 [10 L.Ed.2d at p. 987].)

There is no evidence the preliminary injunction will in any way restrict the flow of services into California or that the statutes create either a direct or indirect burden on interstate commerce. It follows, there is no violation of the federal commerce clause.

## IX

Pearle's argument asserting a violation of the First Amendment is equally inapplicable to the restrictions placed on Pearle. Prohibitions against advertising are a species of restraint upon commercial speech. However, the California statutes comply with the rules most recently set out by the United States Supreme Court. In *Bates* v. *State Bar of Arizona, supra,* 433 U.S. 350, the United State Supreme Court held advertising by attorneys may not be subject to blanket suppression. However, the court did hold advertising by attorneys may be regulated, and mentioned false, deceptive or misleading advertising is a proper subject for regulation.

In *Friedman* v. *Rogers* (1979) 440 U.S. 1, 9-10 [59 L.Ed.2d 100, 109-110, 99 S.Ct. 887], Texas statutes prohibited price advertising by optometrists and the practice of optometry under a trade name. The Texas statute required commercial information about optometrical services appear in a nondeceptive form. The United States Supreme Court also held the prohibition on the practice of optometry under a trade name is constitutionally permissible state regulation in

furtherance of protecting the public from deceptive and misleading use of optometrical trade names.

There is no question the advertising copy presented to the trial court could rationally be construed as misleading and untrue in its reference to "total eye care." In fact Pearle concedes this term, as it is used within the profession, indicates the *full range* of professional optometric services including refraction of the human eye.[5] Pearle argues the misleading nature of the advertisement is cured when customers call Pearle for an eye examination because they are informed Pearle does not perform eye examinations. This simply does not answer the charge that the advertisement itself is misleading. Such a tactic is akin to the "bait and switch" technique.

The case of *State Bd. of Funeral Directors* v. *Mortuary in Westminster Memorial Park, supra,* 271 Cal.App.2d 638, cited by Pearle, is not in point. The advertisement that everything (mortuary service) was offered "in one beautiful place" was truthful. Mortuaries could *lawfully* operate on cemetery premises. Nothing in the advertisement suggested the mortuary was doing cemetery business or that the cemetery was in the mortuary business. Thus there was no misleading advertisement.

X

■ Finally, Pearle contends proper procedural prerequisites were not followed in granting the preliminary injunction; the trial court erred in not making explicit findings the public interest would be best served by the issuance of the injunction (citing *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512 [67 Cal.Rptr. 761, 439 P.2d 889]). *Paul* v. *Wadler* (1962) 209 Cal.App.2d 615 [26 Cal.Rptr. 341] held: "In the federal courts, it has been held that irreparable injury need not be shown in cases involving a preliminary injunction where the injunction is authorized by statute, and the statutory conditions are satisfied [citations]. The theory is that when a legislative body has authorized the injunctive remedy for the violation of a statute, it has determined *as a matter of law* that irreparable injury attends the violation of the statute. . . . The courts of this state have adopted similar reasoning, that is, where an injunction is authorized by statute, a violation thereof is good and sufficient cause for its issuance [citations]." (*Id.,* at p. 625.) (See also *Kofsky* v. *Smart & Final Iris Co.* (1955) 131 Cal.App.2d 530, 532 [281 P.2d 5].) *People* v. *Synanon Foundation, Inc., supra,* 88 Cal.App.3d 304, held absent a clear showing the ordinance is violated, the trial court must weigh the relative harm to the defendant if the in-

---

[5]Moreover, the advertisement would be in violation of section 2556 which makes it unlawful to advertise the *furnishing* of services of an optometrist.

junction is to be issued against the harm to the plaintiff if it is not issued. (*Id.,* at p. 309.) "Stated otherwise, it is only upon clear showing that the zoning ordinance is being violated, that a conclusive presumption of irreparable injury . . . arises so as to justify the injunction without balancing the relative harm to the parties." (*People* v. *Synanon Foundation, Inc., supra,* at p. 309.) As detailed above, there has been a substantial showing of prospective violation of California statutes if the Pearle franchise terms are put into effect. The presumption of irreparable injuries arises in this context.

## XI

### CONCLUSIONS

Pearle fails to distinguish between the practice of an optometrist in which incident thereto he sells eye wear and an eye wear producer and seller who wishes to hire, furnish or go into business with an optometrist. That distinction must be made. It is critical. As *Pennington* v. *Bonelli* (1936) 15 Cal.App.2d 316, 319 [59 P.2d 448] said in 1936: "There can be no question but what the practice of optometry is more than a business. It is a profession relating to the public health, and as such is peculiarly subject to state control." Optometry is not a business or an article of commerce "but a profession dealing with the health and well-being of the people, and shall be and is governed by regulations entirely unnecessary to apply to merchandise." (*Id.,* at p. 321.)

Pearle by its franchise seeks to engage in the corporate practice of a profession. The rules against such practice should not be circumvented by technical agreements concerning the manner optometrists are engaged, designated or compensated by the franchisor. The confidential health care relationship requires the professional's undivided responsibility and freedom from commercial exploitation. This relationship is essential. The public would be jeopardized if a large corporation with pecuniary profits as its principal goal were allowed to dominate the field. (*Painless Parker* v. *Board of Dental Exam., supra,* 216 Cal. 285, 298.)

More than substantial evidence supports the trial court's conclusion Pearle franchise agreement, advertisements, practices, and plans violate various sections of the Business and Professions Code of this state. Therefore the injunction was properly issued. While the lower court is not required to reach the merits of the permanent injunctive relief sought, the factual basis presented to the trial court points to a reasonable probability a permanent injunction will follow a full and complete hearing. The preliminary injunction here performs

its proper function: preservation of the status quo until a final determination on the merits can be made.[6]

Order affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied June 14, 1983. On June 21, 1983, the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 27, 1983.

---

[6]The cross-appeal filed by California Association of Dispensing Opticians and the Pacific Coast Contact Lens Society is without merit. (*Meyer* v. *San Diego* (1900) 130 Cal. 60 [62 P.211].)