[No. D007281. Fourth Dist., Div. One. Aug. 29, 1989.]

JOHN R. LEACH, JR., Plaintiff and Appellant, v.
CITY OF SAN MARCOS et al., Defendants and Respondents.

COUNSEL

Gray, Cary, Ames & Frye, Edward J. McIntyre and Jeanne L. MacKinnon for Plaintiff and Appellant.

Higgs, Fletcher & Mack and John M. Morris for Defendants and Respondents.

OPINION

BENKE, J.—

SUMMARY

In this case a taxpayer, appellant John R. Leach, Jr., is challenging the validity of a redevelopment plan adopted by the City of San Marcos (City). Two years after filing a complaint against the City, Leach moved for a preliminary injunction preventing the City from taking any further action to implement the disputed plan. Although Leach presented evidence which suggests the plan may not conform with the Community Redevelopment Law (Redevelopment Law) (Health & Saf. Code,[1] § 33000), he presented no evidence an injunction was necessary to prevent irreparable harm pending a trial on the merits of his claims. The trial court denied his motion. We affirm. In seeking injunctive relief before a trial on the merits, a taxpayer must demonstrate both a likely violation of law and the likelihood he will suffer irreparable harm.

PROCEEDINGS BELOW

On August 15, 1985, Leach filed a verified complaint against the City, three members of its city council and its redevelopment agency. He alleged the City's recently enacted Redevelopment Plan for Project Area No. 2 (plan) was invalid because it included unblighted, noncontiguous areas solely for the purpose of obtaining tax increment allocations under the provisions of section 33670. He also alleged the environmental impact report certified by the city council in conjunction with its adoption of the redevelopment plan was inadequate. Among other remedies Leach's complaint asked for permanent and preliminary injunctions preventing the City and the redevelopment agency from taking steps to implement the plan.

[1] All statutory references are to the Health and Safety Code unless otherwise specified.

On September 16, 1985, the named defendants filed an answer to the complaint and denied its material allegations.

On September 22, 1987, Leach filed a motion for a preliminary injunction. In support of his motion he relied upon his verified complaint, certified copies of the ordinance making findings and adopting the plan, maps of the area, the environmental impact report, the deposition of one member of the city council and the plan itself. He argued this evidence demonstrated the plan violated both the Redevelopment Law and the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

In particular Leach argued that area A of the plan was not subject to redevelopment because it was a noncontiguous parcel of vacant land which was the proposed site of a $125 million waste-to-energy plant. He argued area D of the plan was unavailable for redevelopment because it was a separate noncontiguous parcel composed almost entirely of agricultural land owned by a developer.

The defendants filed an opposition in which they argued Leach was required to meet the requirements of Code of Civil Procedure section 1094.5 and that in any event he did not present evidence which supported a preliminary injunction.

On October 5, 1987, Leach filed a reply memorandum, along with additional exhibits. The exhibits included a copy of the redevelopment agency's report to the city council and brochures the City prepared in support of the plan.

On October 16, 1987, the trial court heard Leach's motion. At the hearing Leach's counsel offered the court evidence the City was going ahead with the plan. The proffered evidence consisted of development agreements the redevelopment agency had recently made with developers of two areas within the boundaries of the plan.

The trial court's minute order states the motion was denied because Leach did not demonstrate any irreparable harm. Leach filed a timely notice of appeal.

### ISSUES ON APPEAL

On appeal Leach argues he presented undisputed evidence the plan violated the Redevelopment Law and that in light of the violation the trial court should have presumed irreparable harm. He has not pursued his CEQA claim on appeal.

DISCUSSION

I

*The Redevelopment Law*

The substance of Leach's claim arises out of the power given redevelopment agencies by section 33670. Under section 33670 the tax revenues available for local agencies from land within the boundaries of a redevelopment plan may be frozen as of the date the plan is adopted and any tax revenues generated by an increase in property value following adoption of the plan may be allocated exclusively to the local redevelopment agency. Because of the potential for abuse by redevelopment agencies of the tax increment financing available under section 33670, the Legislature has enacted a number of restrictions on the ability of agencies to place areas within the boundaries of a redevelopment plan. (See *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270, 277-279 [133 Cal.Rptr. 859, 555 P.2d 1099]; *Emmington* v. *Solano County Redevelopment Agency* (1987) 195 Cal.App.3d 491, 497-499 [237 Cal.Rptr. 636]; *Regus* v. *City of Baldwin Park* (1977) 70 Cal.App.3d 968, 982 [139 Cal.Rptr. 196].)

One of the principal restrictions on the power of redevelopment agencies is the necessity under section 33320.1 that an agency find that an area is "blighted." "Under the law, blight must be found before redevelopment can be authorized, because, first, without evidence of blight there is no solid justification for compelling taxpayers in one section of the community . . . to subsidize the cost of development of another section of the community by carrying a disproportionate share of the cost of local government. Second, unrestricted use of redevelopment powers fosters speculative competition between municipalities in their attempts to attract private enterprise, speculation which they can finance in part with other people's money. When the extraordinary powers of legislation designed to combat blight and renew decayed urban areas are used as a fiscal device to promote industrial, commercial, and business development in a project area that is merely underdeveloped rather than blighted, competitive speculation may be turned loose. By misemploying the extraordinary powers of urban renewal a redevelopment agency captures pending tax revenues which it can then use as a grubstake to subsidize commercial development within the project area in the hope of striking it rich. Such schemes contemplate borrowing money by issuing bonds on the strength of assured future tax revenues, money which is then used to acquire, improve, and resell property within the project area at a loss as an inducement to business enterprises such as K-Mart to locate within the project area rather than in neighboring communities. In essence, tax revenues are used as subsidies to attract new business. The immediate

gainers are the subsidized businesses. The immediate losers are the taxpayers and government entities outside the project area, who are required to pay the normal running expenses of government operation without the assistance of new tax revenues from the project area." (*Regus* v. *City of Baldwin Park, supra,* 70 Cal.App.3d at p. 982, fn. omitted.)

"Blight" as it is used in the Redevelopment Law means an area "which is characterized by one or more of those conditions set forth in sections 33031 or 33032, causing a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical, social, or economic burden on the community *which cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone.*" (§ 33030, italics added.)[2]

Accordingly, our courts have found redevelopment may not occur " 'just because the public agency considers that it can make a better use or planning of an area than its present use or plan.' " (*Sweetwater Valley Civic Assn.* v. *City of National City, supra,* 18 Cal.3d at p. 278, quoting *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 793 [266 P.2d 105].) "Moreover, it is the declared policy of this state that even though the area is blighted, it should not be subject to the redevelopment process unless redevelopment could not reasonably be expected by private enterprise acting alone. [Citation.]" (*Emmington* v. *Solano County Redevelopment Agency, supra,* 195 Cal.App.3d at p. 500.)

---

[2] Sections 33031 and 33032 provide: "A blighted area is characterized by the existence of buildings and structures, used or intended to be used for living, commercial, industrial, or other purposes, or any combination of such uses, which are unfit or unsafe to occupy for such purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors:

"(a) Defective design and character of physical construction.

"(b) Faulty interior arrangement and exterior spacing.

"(c) High density of population and overcrowding.

"(d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities.

"(e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses." (§ 33031.)

"A blighted area is characterized by properties which suffer from economic dislocation, deterioration, or disuse because of one or more of the following factors which cause a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical, social, or economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone: (a) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development.

"(b) The laying out of lots in disregard of the contours and other topography or physical characteristics of the ground and surrounding conditions.

"(c) The existence of inadequate public improvements, public facilities, open spaces, and utilities which cannot be remedied by private or governmental action without redevelopment.

"(d) A prevalence of depreciated values, impaired investments, and social and economic maladjustment. . . ." (§ 33032.)

As fundamental as a finding of blight is to proper application of the Redevelopment Law, in setting the boundaries of a redevelopment plan, a redevelopment agency may under certain circumstances include noncontiguous areas which are not blighted. The power to include such unblighted areas is governed by the provisions of sections 33320.2 and 33321. Section 33320.2 states: "The area included within a project and project area may be either contiguous or noncontiguous. All noncontiguous areas of a project area shall be either blighted or necessary for effective redevelopment. An unblighted, noncontiguous area shall be conclusively deemed necessary for effective redevelopment if such an area is being used predominantly for: (a) Relocation of owners or tenants from other noncontiguous areas in the same project area from other project areas in the community.

"(b) Low- and moderate-income housing.

"*An unblighted, noncontiguous area shall be deemed not necessary for effective redevelopment if such an area is included for the purpose of obtaining the allocation of taxes from such area pursuant to Section 33670 without other substantial justification for its inclusion. . . .*" (Italics added.)

Similarly section 33321 provides: "A project area need not be restricted to buildings, improvements, or lands which are detrimental or inimical to the public health, safety, or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area. A project area may include lands, buildings, or improvements which are not detrimental to the public health, safety or welfare, but whose inclusion is found necessary for the effective redevelopment of the area of which they are a part. *Each such area included under this section shall be necessary for effective redevelopment and shall not be included for the purpose of obtaining the allocation of tax increment revenue from such area pursuant to Section 33670 without other substantial justification for its inclusion.*" (Italics added.)

As we have seen in this case Leach argues the San Marcos redevelopment plan is defective under sections 33320.2 and 33321 because areas A and D of the plan are noncontiguous, unblighted and included within the plan solely for the purpose of obtaining the tax increment financing available from those areas.

II

*Code of Civil Procedure Section 1094.5*

As their principal argument on appeal, the defendants contend Leach's claims under the Redevelopment Law should be litigated under the

provisions of Code of Civil Procedure section 1094.5 which provides a writ mandate to review the actions of an administrative agency. They argue Leach has an adequate remedy under Code of Civil Procedure section 1094.5 which makes resort to a preliminary injunction unnecessary. They also argue Leach failed to present the trial court with an adequate record as required by Code of Civil Procedure section 1094.6, subdivision (c).

Code of Civil Procedure section 1094.5 has no application to the City's adoption of the redevelopment plan. ▪ Administrative mandamus is not available to review a quasi-legislative determination of a governmental body. (*Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 277-279 [63 Cal.Rptr. 889].) ▪ The adoption of a redevelopment plan, and indeed particular steps taken to advance a redevelopment plan, are quasi-legislative. (See *Oceanside Marina Towers Assn.* v. *Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 745 [231 Cal.Rptr. 910].) Thus, Code of Civil Procedure section 1094.5 did not provide Leach with any remedy and he was not required to present the trial court with the complete administrative record required by section 1094.6.

Rather Leach's challenge to the redevelopment plan was cognizable under Code of Civil Procedure section 863,[3] which provides for a validation proceeding, and Code of Civil Procedure section 526a,[4] which provides for a taxpayer suit to enjoin the unlawful expenditure of public funds.

---

[3] Code of Civil Procedure section 863 provides: "If no proceedings have been brought by the public agency pursuant to this chapter, any interested person may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter. The public agency shall be a defendant and shall be served with the summons and complaint in the action in the manner provided by law for the service of a summons in a civil action. In any such action the summons shall be in the form prescribed in Section 861.1 except that in addition to being directed to 'all persons interested in the matter of [specifying the matter],' it shall also be directed to the public agency. If the interested person bringing such action fails to complete the publication and such other notice as may be prescribed by the court in accordance with Section 861 and to file proof thereof in the action within 60 days from the filing of his complaint, the action shall be forthwith dismissed on the motion of the public agency unless good cause for such failure is shown by the interested person."

[4] Code of Civil Procedure section 526a provides: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. This section does not affect any right of action in favor of a county, city, town, or city and county, or any public officer; provided, that no injunction shall be granted restraining the offering for sale, sale, or issuance of any municipal bonds for public improvements or public utilities.

"An action brought pursuant to this section to enjoin a public improvement project shall take special precedence over all civil matters on the calendar of the court except those matters to which equal precedence on the calendar is granted by law."

■ ■ ■ ■ (§§ 33500, 33501; see also *Regus* v. *City of Baldwin Park, supra,* 70 Cal.App.3d at p. 971.)[5]

## III

### *Preliminary Injunctions*

The general principles which govern Leach's right to a preliminary injunction are well established. ■ " 'This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]' " (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840], quoting *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121].) ■ An order granting or denying an injunction rests in the sound discretion of the trial court and does not constitute an adjudication of the ultimate rights of the parties. (*Ibid.*)

■ "When a trial court denies an application for a preliminary injunction, it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On appeal, the question becomes whether the trial court abused its discretion in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other." (*Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d 277, 286-287.)

### A. Likelihood of Success on the Merits

■ Here Leach presented unrebutted evidence which suggests he will prevail on the merits of his claims under the Redevelopment Law. The record shows that areas A and D are not contiguous. The record further discloses that although area A is adjacent to the County of San Diego's

---

[5] We note however that " '[o]nce the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.' " (*In re Development Plan for Bunker Hill* (1964) 61 Cal.2d 21, 50 [37 Cal.Rptr. 74, 389 P.2d 538].) Accordingly, in reviewing a redevelopment agency's determination, a court will "limit its review to determining whether there was substantial evidence before the board to support the latter's decision." (*Id.* at p. 39.) Thus, without presenting a complete record of the matters considered by the redevelopment agency, it may be difficult for Leach to prevail at trial on the merits of his claim.

landfill, it is also the site of a proposed multimillion waste-to-energy plant. Significantly the brochure the City prepared in seeking voter approval of the redevelopment plan provides:

"Question 5

"If I vote no on Proposition A [approval of the redevelopment plan] will I be helping to stop the proposed waste to energy plant?

"Answer 5

"No. The proposed waste to energy plant, after two years of discussion and controversy, was approved by a wide variety of public agencies in a totally separate process. Although Area A within Project Area #2 does include the proposed waste to energy project site, a yes or no vote will have absolutely no effect on the existence of the waste to energy facility."

This evidence, because it demonstrates that significant development of area A will occur without the redevelopment plan, strongly suggests area A is not blighted within the meaning of the Redevelopment Law. (See *Sweetwater Valley Civic Assn.* v. *City of National City, supra,* 18 Cal.3d at p. 278; *Emmington* v. *Solano County Redevelopment Agency, supra,* 195 Cal.App.3d at p. 500.)

Similarly, with respect to area D, the other noncontiguous area subject to Leach's motion, the record discloses that although formerly a poultry ranch, it too is the likely subject of future development. At the time of the hearing, the City had reached an agreement with the State of California which would have allowed the state, if it decided to do so, to develop a substantial portion of area D as the site for a campus of the California State University. Like the proposed waste-to-energy plant, the state's interest in developing a major portion of area D as a college campus gives rise to an inference the extraordinary powers of redevelopment are not needed to cure any problems posed by the area's status as a former poultry ranch.

As we have seen Leach cannot demonstrate a violation of the Redevelopment Law by simply showing areas A and D are unblighted noncontiguous areas. He also must show the areas are not necessary for effective redevelopment but were included for the purpose of obtaining tax increment financing under section 33670. (§§ 33320.2, 33321.) However, the record contains ample evidence of these elements of Leach's claim as well. Another brochure written by the City to explain the redevelopment process contains the following statements: "Redevelopment Project Areas allow cities such as

San Marcos to financially solve their problems of street repair and improvement, flooding, drainage, revitalization, etc.

"THIS OCCURS BECAUSE A REDEVELOPMENT AGENCY CAN KEEP NEW PROPERTY TAX REVENUE IN SAN MARCOS INSTEAD OF SENDING THE REVENUE AWAY FROM THE COMMUNITY.

". . . . . . . . . . . . . . . . . .

"Redevelopment simply channels property tax increment to San Marcos programs instead of channeling revenue to programs of little interest to citizens of San Marcos.

"This accomplished without increasing your property taxes. It adheres to Proposition 13 principles of protecting your property tax rate and only utilizes property tax increment for improving the quality of life in San Marcos."

In addition to the brochure, in a letter to a county official with respect to the plan the City Manager of San Marcos made the following argument: "The City of San Marcos receives the lowest proportionate share of property tax of any city within the County of San Diego. This is significant and relates to the establishment of redevelopment project areas, in that, any development that occurs within the City of San Marcos essentially returns a higher percentage of revenue back to the County than any other development within the County of San Diego, with the obvious exception of that development that takes place within the unincorporated area. Although one could take the attitude that it's based on the historical property tax trend prior to Proposition 13, I think we also need to recognize that San Marcos is a dramatically growing community and can only reasonably be expected to provide basic infrastructure, economic development opportunities, and elimination of blight if they have an adequate tax base as a starting point. Quite frankly, the property tax base outside of our existing redevelopment project area is marginal. As a City, we are expected and desire to provide the same level of improvements as our neighboring cities throughout the County, but due to the passage of Proposition 13 and subsequent legislation, we are permanently locked into an unrealistically low property tax rate. This unrealistically low property tax rate, in essence, as property develops within the City, subsidizes the County at a much higher level than any other city within the County."

In our view these statements raise a reasonable inference the boundaries of the redevelopment plan were drawn more with an eye toward capturing tax increment financing than curing any urban blight. Indeed the city

manager's argument suggests unblighted areas in the plan, such as areas A and D, may not have been needed to effectuate redevelopment as required by section 33320.2 but may have been included simply because they represented a lucrative source of tax increment financing.

The City's statements, like the evidence Leach presented to show a lack of blight in areas A and D, do not conclusively establish the plan violates the Redevelopment Law. (See *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d 63, 74, fn. 7.) A complete trial on the merits, including we trust a presentation of the agency's record, may disclose either evidence of blight in these areas or some substantial reason, other than tax increment financing, they were included within the plan. (See §§ 33320.2, 33321.) Because the agency is presumed to have acted properly (Evid. Code, § 664), and because judicial review of agency action is limited (*In re Development Plan for Bunker Hill, supra,* 61 Cal.2d at p. 50), such evidence may ultimately prevent Leach from prevailing on the merits. However in opposing Leach's motion, the defendants presented no evidence which reached the merits of Leach's claims. Thus, because Leach produced unrebutted evidence of a potential violation, the trial court would have abused its discretion had it found Leach was not likely to succeed on the merits.

B.   Interim Harm

██   It has been noted that "Even if the trial court had found for appellants on the 'likelihood of success on the merits' factor, it nevertheless could have refused to issue a preliminary injunction if it found that the interim harm to appellants did not outweigh the interim harm to respondents. If this latter implied finding did not constitute an abuse of discretion, the present order must be affirmed." (*Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at 289.)

██   In this case Leach presented no evidence of harm he is likely to suffer as a result of the agency's adoption of the plan. Rather, Leach argues, as he did below, that if the agency proceeds with the plan tax increment revenues will not be available to support services outside the redevelopment area and as a taxpayer outside the area his tax burden will increase. He argues this harm is both imminent enough and sufficiently particularized to support a preliminary injunction. Having reviewed the voluminous record Leach presented below and applicable authorities, we find his arguments unpersuasive.

██   Under Code of Civil Procedure section 526 (second part), subdivision 4, and Civil Code section 3423 an injunction cannot be granted to prevent execution of a public statute. Nonetheless an injunction may issue

where the statute or ordinance is invalid *and* a showing is made of irreparable injury to property or business. (6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 272, p. 234.) ■ However "Facts concerning the irreparable injury which, it is asserted, will result to the complainant unless protection is extended to him must be pleaded in order that the court may consider whether his apprehensions are well founded. A mere allegation that such injury will result is not sufficient. [Citations.] A complaint for an injunction which alleges only general conclusions, not warranted by any pleading of facts, does not state a cause of action to enjoin the acts complained of. [Citations.]" (*E. H. Renzel Co.* v. *Warehousemen's Union* (1940) 16 Cal.2d 369, 373 [106 P.2d 1].)

■ Here the record does not disclose or even suggest any of the tax increment financing which the redevelopment agency hopes to obtain under section 33670 has in fact become available. On the contrary the record suggests that the development of areas A and D, and hence the incremental financing which is at the core of Leach's claims, may not occur for many years. In particular the agreement the agency has executed with the contractor for development of area A does not require commencement of operation of the trash-to-energy plant until January 1, 1995. Until operation of the plant commences, it is difficult for us to imagine how area A will generate any of the incremental tax revenues Leach is concerned about losing.

Similarly the City's agreement with the state for redevelopment of areas around the site of the new state university does not contemplate redevelopment planning until 1990 and does not contemplate completion of redevelopment until 1994. In our view such plans do not now represent an immediate threat to incremental tax revenues and they certainly were less of a threat in 1987 when the trial court denied Leach's injunction. In sum the record supports the trial court's implicit finding tax increment revenues can be fully protected *after* a full trial on the merits of Leach's claims.

In this regard Leach's reliance on *California Assn. of Dispensing Opticians* v. *Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 433-434 [191 Cal.Rptr. 762] (*Pearle Vision*) is misplaced. In that case we affirmed an injunction sought by, among others, the State Board of Optometry against a private party. In doing so, we stated " 'where an injunction is authorized by statute, a violation thereof is good and sufficient cause for its issuance.' " (*Pearle Vision, supra,* 143 Cal.App.3d at p. 433.) However in light of *Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d 286, this assertion is, as a blanket statement of law, incorrect. ■ When the plaintiff is not a governmental entity and the statute does not expressly provide otherwise, a finding of

interim harm is necessary.[6] ▮ Leach is not a governmental entity. Hence we cannot presume harm.

Moreover, even if the record here demonstrated the imminent expenditure of tax increment revenues, such an expenditure would not support a preliminary injuction in favor of a private citizen. In *Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at page 277, the plaintiffs brought a taxpayer's suit under Code of Civil Procedure section 526a, challenging a local ordinance regulating escort services. They argued the regulation was invalid because it was preempted by state law and because it unduly infringed upon their constitutional rights. The trial court denied their application for a preliminary injunction and the Court of Appeal reversed, holding the regulation had been entirely preempted by state law. The Supreme Court granted review and found the regulation was only partially preempted. However the court retransferred the case to the Court of Appeal with instructions to consider the plaintiffs' constitutional claims and whether the plaintiffs had demonstrated the likely occurrence of "interim harm." (*Id.* at pp. 289-290.) On retransfer the plaintiffs, like Leach, asked the Court of Appeal to presume harm upon a showing the regulation was invalid. The Court of Appeal declined and affirmed the trial court's order denying the motion for a preliminary injunction. (*Cohen* v. *Board of Supervisors* (1986) 178 Cal.App.3d 447, 456 [225 Cal.Rptr. 114] [*Cohen II* ].)

"Nowhere in the complaint or elsewhere has Cohen asserted any threat or injury to himself personally from the ordinance. His interest appears to be limited to his taxpayer's pocketbook, an interest which is sufficient to confer statutory standing to maintain this action and bring it to a final judgment permanently enjoining unlawful expenditures (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-270 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]) but which to our knowledge has never been held to substitute for the high degree of existing or threatened injury required for the *prejudgment* injunctive relief sought here." (*Id.* at p. 454.)[7]

---

[6] Indeed, there may be a meaningful distinction between *Pearle Vision* and the case before us since one of the parties seeking relief in *Pearle Vision* was a governmental agency. Arguably, the presumption of harm discussed in *Pearle Vision* applies only where governmental agencies are attempting to prevent a violation of the law. (See *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 71.) (See also *Golden Gate S.T., Inc.* v. *San Francisco* (1937) 21 Cal.App.2d 582, 584 [69 P.2d 899]; *City of Santa Monica* v. *Superior Court* (1964) 231 Cal.App.2d 223, 226-227 [41 Cal.Rptr. 824]; *7978 Corporation* v. *Pitchess* (1974) 41 Cal.App.3d 42, 46 [115 Cal.Rptr. 746]; *Theresa Enterprises, Inc.* v. *Davis* (1978) 81 Cal.App.3d 940, 946 [146 Cal.Rptr. 802].)

[7] The *Cohen II* court went on to reject the taxpayer's argument he was entitled to a conclusive presumption of harm: "Citing the policy that section 526a is to be liberally construed to achieve its remedial purpose of allowing taxpayers to challenge illegal government activity without a showing of special damage to the particular taxpayer (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 268-269 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; see also *White* v.

Contrary to Leach's argument, we find no meaningful distinction between his status as a taxpayer whose burden might be increased by the plan and the plaintiff in *Cohen II* whose tax dollars might have been unlawfully spent enforcing the escort ordinance. While the redevelopment plan may eventually impose a larger burden on taxpayers outside the plan area than enforcement of an escort ordinance, Leach has not suggested how much of a burden he would suffer, and most importantly, how that burden would affect him. Given these circumstances, his status as a taxpayer will not support a preliminary injunction.

Since Leach has not demonstrated any harm he may suffer pending disposition of his case on the merits, and since harm may not be presumed in the context of this case, Leach was not entitled to a preliminary injunction. Accordingly we must affirm the trial court's order. (*Cohen v. Board of Supervisors, supra,* 40 Cal.3d at p. 287.)

Order affirmed.

Wiener, Acting P. J., and Nares, J., concurred.

---

*Davis* (1975) 13 Cal.3d 757, 764-765 [120 Cal.Rptr. 94, 533 P.2d 222]), appellants insist that we must 'conclusively presume' irreparable injury and a balance of interim harms in their favor. All that is required to trigger the presumption, they argue, is a bare showing that public funds are about to be expended in an unconstitutional or otherwise illegal manner. The proposed standard would automatically equate illegal spending with a right to preliminary injunctive relief. For two reasons, that cannot be. First, the *Cohen* decision demands consideration of interim harm as a related *but distinct* question from the underlying merits of the challenge. The proposed rule would leave only the consideration of illegality, and the balance of harms would automatically follow in every case. Second, treating the balance of interim harms as a conclusive presumption leaves no room for a true *balancing*. The preliminary injunction would have to issue in every case where some illegality appeared, no matter how strong the countervailing showing of harm.

"It follows that appellants could not prevail on the balance of interim harms factor by virtue of Cohen's taxpayer standing alone. . . ." (*Cohen II, supra,* 178 Cal.App.3d at p. 454.)