Filed 2/8/21 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MIDWAY VENTURE LLC et al., | D078375 |
| Plaintiffs, Cross-defendants, and Respondents, | |
| v. | (Super. Ct. No. 37-2020-00038194-CU-CR-CTL) |
| COUNTY OF SAN DIEGO et al., | |
| Defendants and Appellants; | |
| GAVIN NEWSOM, as Governor, etc., et al., | ORDER MODIFYING OPINION AND DENYING REHEARING. |
| Defendants, Cross-complainants, and Appellants. | NO CHANGE IN JUDGMENT. |

THE COURT:

It is ordered that the opinion filed herein on January 22, 2021 be modified as follows:

On page 32, footnote 5, the phrases "in this appeal" and "to uphold" are added to the second sentence, so that the modified sentence reads as follows:

> The injunction here, however, was not limited to the prior scheme, and the adult entertainment businesses have given no indication in this appeal they seek to uphold such a

limited injunction, which would have no effect on enforcement of the current Blueprint for a Safer Economy or the Regional Stay at Home Order.

On page 35, second full paragraph, the phrase "and imply that it involves 'vastly different facts and issues' " is added to the first sentence, so that the modified sentence reads as follows:

> On the substance, the adult entertainment businesses do not address *Arcara*, except to say it is inapplicable and imply that it involves "vastly different facts and issues"— without further explanation.

On page 43, at the end of the first paragraph, the following new footnote 8 is added, which will require renumbering of all subsequent footnotes:

> After we filed our opinion in this appeal, the United States Supreme Court enjoined the enforcement of some of the house of worship restrictions at issue in the *South Bay* district court proceedings, pending disposition of a related petition for writ of certiorari. (*South Bay United Pentecostal Church v. Newsom* (2021) __ U.S. __ [2021 WL 406258].) However, neither the Supreme Court's unsigned order nor its concurring and dissenting opinions call into question the portion of the *South Bay* opinion quoted in the text or our evaluation of this appeal more broadly.

There is no change in the judgment.

Respondents' petition for rehearing is denied.

HALLER, Acting P. J.

Copies to: All parties

2

Filed 1/22/21 (unmodified opinion)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MIDWAY VENTURE LLC et al., | D078375 |
| Plaintiffs, Cross-defendants, and Respondents, | |
| v. | (Super. Ct. No. 37-2020-00038194-CU-CR-CTL) |
| COUNTY OF SAN DIEGO et al., | |
| Defendants and Appellants; | |
| GAVIN NEWSOM, as Governor, etc., et al., | |
| Defendants, Cross-complainants, and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge. Reversed with directions.

Thomas E. Montgomery, County Counsel, and Jeffrey P. Michalowski, Deputy County Counsel, for Defendants and Appellants.

Lounsbery Ferguson Altona & Peak, Helen Holmes Peak and Gregory L. Lusitana, for the City of San Marcos as Amicus Curiae on behalf of Defendants and Appellants.

Xavier Becerra, Attorney General, Thomas S. Patterson, Assistant Attorney General, Anthony R. Hakl, Kristin A. Liska and Patty Li, Deputy Attorneys General, for Defendants, Cross-complainants, and Appellants.

Niddrie Addams Fuller Singh, Victoria E. Fuller, Rupa G. Singh; Vivoli Saccuzzo, Jason P. Saccuzzo; Law Office of Steve Hoffman and Steve Hoffman, for Plaintiffs, Cross-defendants, and Respondents.

Wright, L'Estrange & Ergastolo, Robert C. Wright and Andrew E. Schouten, for the Food & Beverage Association of San Diego County, Inc. as Amicus Curiae on behalf of Plaintiffs, Cross-defendants, and Respondents.

Caldarelli Hejmanowski Page & Leer LLP, Marisa Janine-Page; Wilson Elser Moskowitz Edelman & Dicker LLP, Bruno Katz, for 640 Tenth, LP d/b/a/ Cowboy Star Restaurant and Butcher Shop; O'Frank, LLC d/b/a Home & Away Encinitas; Fit Athletic Club-San Diego, LLC; and Crossfit East Village Corporation d/b/a/ Bear Republic, as Amici Curiae on behalf of Plaintiffs, Cross-defendants, and Respondents.

In this appeal, we consider a preliminary injunction prohibiting the County of San Diego, its public health officer Wilma J. Wooten, the California Department of Public Health (CDPH), and Governor Gavin Newsom from enforcing COVID-19-related public health restrictions against any business offering restaurant service in San Diego County, subject to safety protocols. Despite the focus of the injunction—and the interest it generated from third parties seeking to provide amicus briefs—this lawsuit was never about restaurant restrictions or the ability to dine outdoors in San Diego County. It was brought by two San Diego businesses that offer live nude adult

2

entertainment as well as restaurant service.[1] They claimed that State and County restrictions on *live entertainment* violated their First Amendment right to freedom of expression. They were not seeking to open their restaurants without the live entertainment component of their businesses.

The State and County eventually loosened their restrictions on live entertainment, but as the COVID-19 pandemic worsened, they imposed new restrictions on restaurants. These new restaurant restrictions severely curtailed the adult entertainment businesses' operations. But these new restrictions were unrelated to live entertainment or the First Amendment.

Despite the narrow scope of the issues presented, the trial court granted expansive relief when it issued the injunction challenged here. It went beyond the claims of the adult entertainment businesses and invalidated restrictions on restaurants—even though such relief had never been requested or addressed by the parties.

It is a fundamental aspect of procedural due process that, before relief can be granted against a party, the party must have notice of such relief and an opportunity to be heard. Because restaurant restrictions were never part of the adult entertainment businesses' claims, the State and County had no notice or opportunity to address them. The trial court therefore erred by enjoining the State and County from enforcing COVID-19-related public health restrictions on restaurants.

---

[1]    The named plaintiffs are Midway Venture LLC d/b/a Pacers Showgirls and Pacers Showgirls International, Peter Balov, F-12 Entertainment Group Inc. d/b/a Cheetahs, and Rich Buonantony. Balov and Buonantony are the "responsible managing officers" of Pacers and Cheetahs, respectively, under the local ordinance regulating adult entertainment establishments. (See San Diego Mun. Code, § 33.3601 et seq.)

Because the *procedure* used by the trial court was improper, the trial court's actions render us unable to address the *substance* of this new challenge to restaurant restrictions. On remand, in the trial court, the adult entertainment businesses may seek to amend their claims to address restaurant restrictions. We express no opinion on the subject.

We have received several amicus briefs, as noted above, and we have considered each party's submission. We do not separately address these submissions, however, because they either duplicate arguments made by the parties to this appeal, or they seek to expand the issues before this court and are therefore irrelevant. We acknowledge the concerns raised by these parties, but this appeal is not the proper mechanism to address these concerns given the limited issues before us.

The claims properly before the trial court, and this court, are based on the First Amendment. It is well-settled that the adult entertainment businesses have a First Amendment right to provide live entertainment. But business restrictions imposed for other purposes, unrelated to the suppression of expression, are not invalid simply because they incidentally burden expressive conduct. The operations of the adult entertainment businesses are currently limited because of restaurant restrictions. Those restaurant restrictions are unrelated to the suppression of speech and therefore do not run afoul of the First Amendment. Absent a First Amendment concern or other reason for heightened scrutiny, the restrictions are valid if they are rationally related to a legitimate governmental interest. Because the adult entertainment businesses' claims were framed under the First Amendment, they never argued in the trial court that the restaurant restrictions did not meet this low standard. We therefore have no occasion to

address such an argument regarding restaurant restrictions for the first time on appeal.

To the extent the adult entertainment businesses continue to challenge limitations on live entertainment (as opposed to restaurant restrictions), we conclude the limitations are valid, content-neutral restrictions on expressive conduct. Under well-established law, they do not run afoul of the First Amendment.

Finally, even setting aside the defects noted above, the trial court erred by issuing the injunction because it is unreasonably vague. The injunction generally prohibits the State and County from enforcing public health orders against the adult entertainment businesses and other restaurants, but it allows the enforcement of "protocols that are no greater than is essential to further Defendants' response to control the spread of COVID." The injunction does not explain which protocols are "essential," and the record provides no guidance on this important question. Where, as here, an injunction does not provide adequate notice of its scope, it cannot be enforced.

In sum, the trial court erred by entering an overbroad injunction that was unsupported by the law and which violated the due process rights of the State and County. We therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

The horrors of the COVID-19 pandemic do not need to be described in detail here. In the United States, hundreds of thousands are confirmed dead, including tens of thousands of Californians. Hundreds more Californians die each day. Our hospitals and intensive care units are overwhelmed, threatening even routine medical care. It is the worst American public health crisis in a century.

Restrictions imposed to combat the spread of COVID-19 have caused great personal and economic suffering as well. Individuals cannot travel or meet with friends and loved ones. Businesses have closed or drastically curtailed their operations. Employees have lost their jobs and their livelihoods. State and local governments face declining revenue even as demands for their services increase.

Balancing these risks and harms in the midst of a deadly pandemic is exceedingly difficult. It is a responsibility primarily entrusted to our elected officials, who are ultimately accountable to the public. It is our role to determine the legal and constitutional limits on their authority—but in so doing, we are constrained by the issues properly before this court.

The disease known as COVID-19 is caused by a previously-unknown virus, SARS-CoV-2. Evidence submitted to the trial court, in the form of a declaration from a state epidemiology and infectious disease expert, shows that the virus's most common mode of transmission is person-to-person, "through respiratory particles such as those that are produced when an infected person coughs or sneezes or projects his or her voice through speaking, singing, and other vocalization. These particles can land in the mouths, noses, or eyes of people who are nearby or possibly can be inhaled into their lungs." Additionally, "[s]ome evidence exists that [the virus] might also be spread through aerosol transmission, that is, through smaller particles (of less than 5 microns) emitting from an infected person . . . that can travel farther than respiratory droplets."

The virus can be transmitted even by individuals who do not show symptoms. "The fact that [the virus] can be spread by individuals who are pre-symptomatic or asymptomatic is one of the aspects of the COVID-19 that makes it difficult to control. Individuals without symptoms are generally

6

unaware they are infected and are thus less likely to be taking steps to avoid transmission of the virus. Therefore, individuals who themselves may have been unknowingly infected by others can themselves become unknowing transmitters of the virus."

When a person is exposed to the virus, the likelihood they will become infected depends in part on the amount of virus they encounter. "Therefore, it is important to take steps to limit interactions where conditions support exposure to higher viral doses."

Because the primary mode of transmission is person-to-person, any activity that brings individuals together increases the risk of additional infections. The more individuals that gather together, and the longer they spend together, the greater the risk. Similarly, because the likelihood of infection increases with viral exposure, any activity that promotes the spread of respiratory droplets (or increases the viral load and concentration of infectious particles) likewise increases the risk. Such activities include singing, talking, and laughing.

By the same token, limiting gatherings, wearing cloth face coverings, and maintaining physical distance (more than six feet of separation) reduces the risk of infection. These measures do not eliminate the risk, but they decrease its likelihood by reducing the chance that an individual will encounter a viral dose sufficient to cause an infection.

"Restaurants and bars are considered high risk environments for transmission because they are settings where people from different households share the same space for prolonged periods of time. Further, eating and drinking require removal of face coverings which can increase the spread of infectious particles. Additionally, physical movement within the establishment, duration of time spent in the establishment, and the degree of

7

social mixing among individuals and groups outside one's household may all be significant in these sectors, which substantially elevates the risk of transmission even where face coverings can be worn."

Beginning in March 2020, the State and County imposed a series of public health restrictions intended to combat the spread of the virus. These restrictions shifted as the pandemic ebbed and flowed and as scientists better understood transmission of the virus.

As noted, the adult entertainment businesses that brought this lawsuit offer live nude adult entertainment as well as restaurant service. At the outset of the pandemic, in accordance with public health restrictions, the adult entertainment businesses closed. As restrictions loosened, they found that neither the State nor the County provided guidance for reopening adult entertainment establishments. One of the businesses, Pacers, submitted a proposal to the County and the City of San Diego to operate outdoors. This proposal was not accepted by the San Diego Police Department (SDPD), which is responsible for licensing adult entertainment businesses. Next, Pacers submitted a plan for reopening to the City of San Diego. The plan proposed a 15-foot separation between the stages and any tables, one performance artist per stage at a time, a mask requirement for performers and other staff, and cleaning and sanitation protocols, among other conditions. In an email, Pacers told the City that it was "told by the SDPD that we would be cleared for outdoor performances so long as *you* give us the approval."

Meanwhile, in August 2020, the State released its "Blueprint for a Safer Economy," which was a plan for relaxing restrictions on business and personal activities. The Blueprint established four tiers of restrictions based on the severity of the pandemic in a given county. The tiers were color-coded,

8

from yellow to orange to red to purple, representing increasing levels of pandemic severity and public health restrictions. Restaurants in counties in the yellow, orange, and red tiers could operate indoors with restrictions. Restaurants in counties in the purple tier could operate only outdoors. Live entertainment at restaurants was prohibited. The Blueprint does not appear to have specifically addressed adult entertainment establishments.

After Pacers did not receive any response to its proposed reopening plan, it began operations. The other adult entertainment business, Cheetahs, adopted a similar plan and reopened.

Approximately a month after the adult entertainment businesses reopened, an incident occurred in Pacers' parking lot that resulted in the stabbing of a professional baseball player. The incident prompted a great deal of negative media attention, including allegedly false stories about Pacers' operations.

Three days after the stabbing, the County, through its public health officer, issued a cease-and-desist letter to Pacers. The letter stated that, under applicable public health regulations, restaurants were allowed to operate indoors at 25 percent capacity (as well as outdoors) but "restaurants must discontinue live entertainment." These regulations were based on the County's then-current "red" tier status. The cease-and-desist letter noted that a recent inspection of Pacers showed that "your establishment is conducting live entertainment in violation of" public health orders. The letter continued, "If you do not comply, we will take actions necessary to enforce the Orders. Failure to comply may result in criminal misdemeanor citations with a $1,000 fine for *each* violation. In addition, if violations continue, I may issue an Order closing the facility." Several days later, the County issued a similar cease-and-desist letter to Cheetahs. In response to the cease-and-

9

desist letters, Pacers (and apparently Cheetahs) ceased all adult performances.

In late October 2020, the adult entertainment businesses filed this lawsuit. Their complaint recounted the history of their closure, their reopening plan, and their eventual reopening. They alleged that the cease-and-desist letters were based on "false news reports" related to the stabbing incident. They wrote, "[W]hile Dr. Wooten acknowledged Pacers' right to remain open solely as a restaurant, Dr. Wooten warned that if there were any violations of her order prohibiting live adult entertainment, she would issue an order closing Pacers entirely."

The adult entertainment businesses alleged that the County had "implicitly or tacitly" allowed other restaurants and businesses to have live entertainment. They also alleged that State and County public health regulations allowed other businesses and activities to occur "despite the possibility of far more contact among members of the public than what is even conceivably possible" under the adult entertainment businesses' reopening plan. They specifically identified places of worship, movie theaters, dance studios, yoga studios, hair and nail salons, and tattoo parlors, among others.

The adult entertainment businesses' first cause of action was for declaratory and injunctive relief. They alleged that the State and County parties had deprived them of their First Amendment rights of free speech and free expressive association and denied them equal protection of the laws. They sought "a declaration of their right to allow adult themed performances to occur at their venues" pursuant to their reopening plans. They also sought "a declaration preventing Defendants from completely prohibiting all live adult entertainment and requiring Defendants to provide clear guidance that

10

would allow for live adult entertainment in the City and County of San Diego," as well as a declaration "[r]ecognizing that Plaintiffs' Constitutional rights to free speech and free expressive conduct are not eliminated due to the Covid-19 related restrictions and pandemic."

Their second cause of action was for violation of title 42 United States Code section 1983. It rested on three grounds. First, the adult entertainment businesses alleged the State and County restrictions on their businesses represented a content-based restriction on speech in violation of the First Amendment. Second, they alleged that the restrictions deprived them of equal protection of the laws because the County allowed "activity and conduct that is similar, if not identical, in its impact and effects" on the spread of COVID-19. They maintained, "The challenged measures lack any rational basis, are arbitrary, capricious, and vague, and are a palpable invasion of rights secured by fundamental law in violation of the Equal Protection Clause." Third, the adult entertainment businesses alleged that the State and County parties had "taken away property rights and liberties" without due process of law.

Under this cause of action, the adult entertainment businesses sought the issuance of a temporary restraining order, preliminary injunction, and permanent injunction "restraining and preventing any governmental entity or law enforcement officer from applying and enforcing the provisions [of] the cease and desist orders, or any other related orders, that prevent Plaintiffs from being allowed to provide live adult entertainment under the restrictions outlined above, and finding that Plaintiffs are exempt from all of the requirements of the cease and desist orders."

The third and final cause of action was for a writ of mandate under Code of Civil Procedure section 1085. The adult entertainment businesses

11

alleged that a writ was proper because the State and County parties had infringed on their constitutional rights or prevented them from exercising their constitutional rights. They sought a writ compelling the State and County parties "to set aside their cease and desist orders, and to allow for live adult entertainment."

The adult entertainment businesses filed an ex parte application for a temporary restraining order. They stated, "This application is made on the grounds that [the State and County parties] have, together, effectuated for all practical purposes [a] complete ban on live performances by adult entertainers in violation of Plaintiffs' constitutionally protected civil rights, including the right to freedom of speech, equal protection, and due process." They asserted, "At issue here is the right of Plaintiffs to allow for live adult entertainment at their venues. Such live entertainment is protected by the First Amendment as expressive conduct." They emphasized, "Plaintiffs seek no more than to allow these socially distanced adult performances in their venues that are currently only allowed to operate as restaurants at 25% capacity."

The adult entertainment businesses argued that they had a reasonable probability of prevailing on their claims under title 42 United States Code section 1983 and would be entitled to injunctive relief on that basis. They maintained that irreparable injury was presumed because their First Amendment rights were threatened. They claimed that they had suffered substantial financial losses and were not viable businesses without live adult entertainment.

The adult entertainment businesses supported their application with declarations from their general managers, who described their attempts to reopen, their conversations with the County and City, and the effect of the

cease-and-desist letters on their business. They also provided the trial court with various public health orders, correspondence, and the cease-and-desist letters themselves, among other documents.

The County parties opposed the application for a temporary restraining order, primarily on the ground that the adult entertainment businesses had not established irreparable harm. They noted that the businesses could still operate as restaurants, which had been the status quo for many months before they reopened as adult entertainment establishments.

The State parties opposed as well. They argued that the adult entertainment businesses had unreasonably delayed seeking relief and therefore could not show irreparable harm. On the merits, they argued that the public health orders were not unconstitutional. They asserted that "live entertainment at venues such as Plaintiffs' venues poses additional risks because it encourages patrons to linger for extended periods in an environment where people are consuming alcohol and are inclined to let their guards down" regarding COVID-19 precautions. They argued, "The longer duration increases both the time of exposure as well as the likelihood that food and alcohol will be consumed in larger quantities, activities that require the removal of masks [and] thus increases the risk to both customers and to the workforce." The State parties supported their opposition with a declaration, originally filed in other litigation, written by the state epidemiology and infectious disease expert mentioned above.

At the hearing on their application for a temporary restraining order, counsel for the adult entertainment businesses continued to focus on the issue of live adult entertainment. Counsel argued that "[t]he issue that is before the [c]ourt is a total ban on live entertainment," and contended that

"this ban implicate[d] free speech rights protected by the First Amendment[.]"

The trial court found that the balance of harms favored the adult entertainment businesses and there was some possibility the businesses would prevail on the merits of their claim. The court issued a temporary restraining order enjoining the State and County parties "from enforcing the provisions [of] the cease and desist orders, or any other related orders, that prevent Plaintiffs from being allowed to provide live adult entertainment, subject to the least restrictive means to further Defendants' response to control the spread of COVID." It also issued an order to show cause why a preliminary injunction should not issue and set a briefing schedule.

In a supplemental brief, the adult entertainment businesses urged the court to adhere to its prior analysis and issue a preliminary injunction. They argued that the State and County parties had not justified their "outright ban of Plaintiff[s'] fundamental First Amendment rights." They maintained that the prohibition on live entertainment was content-based on its face because it did not apply to other forms of protected expression such as worship services, political rallies, or movie theaters. But even if it were not content-based, the adult entertainment businesses argued that it did not meet even the intermediate scrutiny applied to content-neutral restrictions on First Amendment rights.

The adult entertainment businesses supported their brief with a declaration from an epidemiologist and public health expert. The expert wrote, "I have been asked to opine on the issue of whether a restaurant would increase the risk to its patrons or employees if a dancer performing on a stage were present if the dancer is 15 feet away from all patrons and suitably masked. There is no scientific evidence of increased risk to the patrons if

14

dancing is allowed at a restaurant under those conditions." The general managers of the adult entertainment businesses also submitted declarations describing their reopening following the temporary restraining order. The general manager of Cheetahs noted that his establishment does not serve alcohol. Both general managers asserted that they were aware of no COVID-19 cases that had been traced back to their establishments.

At this point, in late November 2020, the State provided updated guidance governing restaurants. In the yellow, orange, and red tiers, where restaurant operations were allowed indoors, the updated guidance also allowed live performances indoors at restaurants. In the purple tier, where restaurant operations were allowed outdoors only, the updated guidance allowed live performances outdoors at restaurants. In essence, the updated guidance allowed live performances at restaurants to the same extent that the restaurants themselves were allowed to operate.

A week later, however, the State announced a new framework in response to dramatically rising COVID-19 cases, hospitalizations, and test positivity rates. The new framework, the Regional Stay at Home Order, strictly limited business activity and personal interaction in a region if the intensive care unit (ICU) capacity in the region fell below 15 percent. The Regional Stay at Home Order is discussed in more detail below. As relevant here, if ICU capacity fell below 15 percent, restaurants in the affected region would be limited to take-out and delivery service only.

Meanwhile, in a supplemental brief, the State parties contended that the updated guidance rendered the adult entertainment businesses' claims moot because "Plaintiffs have the relief they sought through their Complaint." In their view, "The activities that Plaintiffs seek to carry out, according to the Complaint and their preliminary injunction application, are

15

now permitted" under the updated guidance. The State parties maintained that the adult entertainment businesses could not simply shift their arguments to new regulations; they would have to amend their complaint to challenge the updated guidance or future public health orders.

Assuming the adult entertainment businesses' claims were not moot, the State parties contended the businesses could not establish a likelihood of prevailing on the merits. The State argued that restrictions on live entertainment were constitutional as content-neutral measures to combat the COVID-19 pandemic. The State claimed that the adult entertainment businesses' equal protection claims were derivative of their First Amendment claims and failed for the same reason. And any procedural due process claim could not succeed because the regulations were generally applicable to businesses throughout the State and County.

The State parties supported their brief with copies of the November 2020 updated guidance and other regulations. They also submitted an additional declaration from the state epidemiology and infectious disease expert. This declaration, also from another litigation, described more specifically the COVID-19 risks at restaurants and bars.

In their supplemental brief, the County parties focused on rebutting the adult entertainment businesses' allegations of selective enforcement. They submitted a declaration from the chief of the County's COVID-19 compliance team. The compliance chief noted that the County had moved into the "purple" tier, based on deteriorating public health conditions, which allowed only outdoor restaurant operations. He explained that the County's enforcement of public health regulations is "complaint-driven" and it does not have the resources to continually inspect all business establishments and other activities. He explained that the County investigates complaints and, if

a violation is found, the County sends a cease-and-desist letter. For example, the County's cease-and-desist letter to Pacers was prompted by an earlier SDPD undercover inspection that revealed violations of local ordinances as well as public health regulations. The SDPD sent a letter to Pacers documenting the violations, with a copy to the County. The County then sent its own cease-and-desist letter.

The compliance chief explained that the goal of the County's cease-and-desist letters is to obtain voluntary compliance with public health regulations. But, if unsuccessful, the County can initiate enforcement actions, including an immediate closure order. Through November 2020, the County had issued 125 cease-and-desist letters for violations of the COVID-19 public health regulations. The County had also issued seven immediate closure orders. These letters and orders covered a wide variety of businesses and other activities. In addition, the compliance chief stated, "Plaintiffs' businesses were not the only establishments that received a cease-and-desist letter from the County concerning live entertainment," identifying four others. He maintained that the County never permitted or approved live entertainment or performances at the adult entertainment businesses. The County's public health regulations incorporate State guidance, and the County has no authority to deviate from the State's direction. The State guidance applicable to the adult entertainment establishments is the guidance governing restaurants.

In their supplemental reply brief, the adult entertainment businesses disputed that their claims were moot. They argued the controversy had broad public interest, the State and County could reimpose restrictions on live entertainment, and material questions remained for the court's determination, including the application of the updated guidance to *live adult*

17

*entertainment.* They asserted, "Plaintiffs are entitled to a definitive order from the Court that makes allowances for the continuance of live adult entertainment." On the merits, the adult entertainment businesses reiterated their view that restrictions on live adult entertainment were unconstitutional under the First Amendment, whether viewed as content-based or content-neutral.

After hearing argument, the trial court issued a detailed order granting a preliminary injunction. The court began by disposing of several evidentiary matters.[2] It then recounted the history of the dispute, including the adult entertainment businesses' efforts to reopen. The court identified the businesses' safety protocols and noted the opinion of their expert that a live dancer on a physically distanced stage would not increase the risk of COVID-19 transmission at a restaurant. The court asserted, "Defendants have not submitted any evidence to refute [these declarations]. The Court infers that . . . the County possesses contact tracing data and has the power to produce such evidence to refute Plaintiffs' assertions that Plaintiffs providing live adult entertainment and San Diego County businesses with restaurant service, such as plaintiffs' establishments, subject to protocols, do **not** present any risk—much less a greater risk than before Governor Newsom issued his December 3, 2020 Regional Stay at Home Order—to the spread of COVID in San Diego County. Since the County could have produced 'stronger evidence,' the Court discounts the County's 'weaker evidence.' [Citation.] [¶] Accordingly, the Court finds that Plaintiffs have

---

[2] With one exception, these evidentiary rulings have not been challenged by the parties on appeal. We therefore have no occasion to consider them. The one exception, regarding a request for judicial notice, will be discussed below.

18

been devoid of COVID, have done nothing to contribute to the spread of COVID, and have honored their representations to . . . the County."

The trial court went on, "Given every opportunity, the County has provided the Court with no evidence that San Diego County businesses with restaurant service, such as Plaintiffs' establishments, who've implemented protocols as directed by the County, present any risk—much less a greater risk than before Governor Newsom issued his December 3, 2020 Regional Stay at Home Order—to the spread of COVID." The court wrote, "The obvious question, from the Court's perspective, is, in the absence of evidence, why is the State's Regional Stay at Home Order limiting San Diego County restaurant businesses 'to take-out, pick-up, or delivery' rational?" The court found that the state's epidemiology and infectious disease expert "provides a general overview of COVID-19 in California but says nothing to support restrictions, in addition to existing protocols, in San Diego County."

In evaluating the adult entertainment businesses' claims, the trial court found that intermediate scrutiny applied because the restrictions were unrelated to suppressing the businesses' expression. But it found that "shuttering Plaintiffs' establishments except 'to take-out, pick-up, or delivery,' in the absence of evidence to support the restrictions, is neither 'neutral' nor 'narrow.' Defendants' characterization of Plaintiffs' establishments as restaurants or as non-essential does not dilute Plaintiffs' right to first amendment protection." The court noted, however, that it could not find "that the County has arbitrarily enforced the prohibition of live entertainment indoors at bars and restaurants . . . ."

Reviewing the recently-enacted Regional Stay at Home Order, the court wrote that it "questions whether there is a rational nexus between the percentage of ICU bed capacity throughout the Southern California Region

19

**and** Plaintiffs providing live adult entertainment and businesses with restaurant service, such as Plaintiffs' establishments, in San Diego County. Defendants have presented no evidence that businesses with restaurant service, such as Plaintiffs' establishments, who've implemented protocols as directed by the County, have impacted ICU bed capacity throughout the Southern California Region (much less in San Diego County)."

The court found that the adult entertainment businesses had shown "they have exhausted their capital trying to comply with Defendants' 'endless and bewildering' orders, have sustained significant, if not draconian, losses, and are fearful that their businesses may be closed permanently if Defendants' latest orders are not enjoined." Balanced against this harm, the court reiterated its finding that the State and County parties had not shown that restaurants or live entertainment present *any* risk of spreading COVID, if they follow safety protocols.

In light of these findings, the court determined that "the harm to Plaintiffs if the preliminary injunction is denied is greater than the harm to Defendants if the preliminary [injunction] is granted" and "it is likely that the Plaintiffs will prevail on the merits of one or more of their claims." It issued an injunction prohibiting the State and County "from enforcing the provisions of the cease and desist order, or any related orders including the State's Regional Stay [at] Home Order, that prevent 1) Plaintiffs from providing live adult entertainment; and 2) San Diego County businesses with restaurant service, such as Plaintiffs' establishments, from continuing to operate their respective businesses, subject to protocols that are no greater than is essential to further Defendants' response to control the spread of COVID." The court made its order effective immediately.

The next day, the County parties filed an ex parte application requesting clarification of the scope of the preliminary injunction, "specifically whether the injunction applies only to Plaintiffs' restaurant establishments with live adult entertainment, or to all restaurants within the County of San Diego, or to some subset of restaurants within the County." At a hearing, the court explained that "the Court's intention is that all businesses which provide restaurant service, meaning all restaurants in the [C]ounty of San Diego, are encompassed within the scope of the Court's order. It's not limited to plaintiffs who also provide restaurant service, but it is intended to encompass all restaurants within the [C]ounty of San Diego."

The State and County parties appeal. The State parties filed an emergency application for a temporary stay pending appeal, which we granted. The stay remains in force.

## DISCUSSION

### I

### *Preliminary Injunction Standards*

"In deciding whether to issue a preliminary injunction, a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction." (*Butt v. State of California* (1992) 4 Cal.4th 668, 677-678.) "The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Id.* at p. 678.)

" 'Ordinarily, appellate review is limited to whether the trial court abused its discretion in evaluating the foregoing factors. [Citation.] "Occasionally, however, the likelihood of prevailing on the merits depends

21

upon a question of pure law rather than upon [the] evidence to be introduced at a subsequent full trial.  This issue can arise, for example, when it is contended that an ordinance or statute is unconstitutional on its face and that no factual controversy remains to be tried.  If such a question of pure law is presented, it can sometimes be determinative over the other factor, for example, when the defendant shows that the plaintiff's interpretation is wrong as a matter of law and thus the plaintiff has no possibility of success on the merits.  [Citations.]" [Citations.]  Of course, such questions of law are subject to de novo review.' " (*Jamison v. Dept. of Transportation* (2016) 4 Cal.App.5th 356, 362.)

In other words, "[n]otwithstanding the applicability of the abuse of discretion standard of review, the specific determinations underlying the superior court's decision are subject to appellate scrutiny under the standard of review appropriate to that type of determination.  [Citation.]  For instance, the superior court's express and implied findings of fact are accepted by appellate courts if supported by substantial evidence, and the superior court's conclusions on issues of pure law are subject to independent review." (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739.)  "[W]hen the matter is solely a question of a violation of law the standard of review is not abuse of discretion but whether statutory or constitutional law was correctly interpreted and applied by the trial court." (*Cal. Ass'n of Dispensing Opticians v. Pearle Vision Ctr.* (1983) 143 Cal.App.3d 419, 426.)

"Where, as here, the defendants are public agencies and the plaintiff seeks to restrain them in the performance of their duties, public policy considerations also come into play.  There is a general rule against enjoining public officers or agencies from performing their duties.  [Citations.]  This rule would not preclude a court from enjoining unconstitutional or void acts,

22

but to support a request for such relief the plaintiff must make a significant showing of irreparable injury." (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1471; see *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1464.)

"Finally, our decision does not constitute a final adjudication of the ultimate rights in controversy. [Citations.] In reviewing the propriety of a ruling on an application for a preliminary injunction, we merely decide whether the trial court abused its discretion based on the record before it at the time of the ruling." (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625-626.)

## II

### *The Scope of the Injunction and Due Process*

The State and County parties first argue that the preliminary injunction was an abuse of discretion and violated due process because it granted relief never sought by the adult entertainment businesses, based on legal theories never addressed by the parties. We agree.

"It is a fundamental concept of due process that a judgment against a defendant cannot be entered unless he was given proper notice and an opportunity to defend." (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1166.) " 'In a contested proceeding, no court may render judgment without conforming to the constitutional guarantees which afford due process of law. [Citation.] Due process requires that all parties be notified of the facts and issues in dispute, that each party be afforded a fair opportunity to present evidence in open court, and that judgment be rendered based on an evaluation of the evidence on each side, findings of fact and conclusions of law.' " (*Carr v. Kamins* (2007) 151 Cal.App.4th 929, 936; accord, *Spector v. Superior Court of San Mateo County* (1961) 55 Cal.2d 839, 843.)

23

The due process guarantees of notice and an opportunity to be heard have little value unless a party " 'is advised of the *nature* of the hearing giving rise to that opportunity, including what will be decided therein.' " (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 746.)  If a court's conception of the nature of the hearing materially changes, it must give an affected party the opportunity to be heard before rendering its decision.  (*Moore v. California Minerals Products Corp.* (1953) 115 Cal.App.2d 834, 837.)  Denying that opportunity deprives the affected party "of a substantial right to which it was entitled by virtue of the guarantee of due process."  (*Ibid*.)  A court that rules on a material issue "without even mentioning to the parties at the time that it was considering the question" violates due process.  (*Bricker v. Superior Court* (2005) 133 Cal.App.4th 634, 639.)

These principles are embodied, in part, in the Rules of Court governing preliminary injunctions.  "A party requesting a preliminary injunction may give notice of the request to the opposing or responding party either by serving a noticed motion under Code of Civil Procedure section 1005 or by obtaining and serving an order to show cause (OSC).  An OSC must be used when a temporary restraining order (TRO) is sought, or if the party against whom the preliminary injunction is sought has not appeared in the action."  (Cal. Rules of Court, rule 3.1150(a).)  "The OSC and TRO must be stated separately, with the OSC stated first.  The restraining language sought in an OSC and a TRO must be separately stated in the OSC and the TRO and may not be incorporated by reference.  The OSC must describe the injunction to be sought at the hearing.  The TRO must describe the activities to be enjoined pending the hearing."  (*Id.*, rule 3.1150(c).)

As an initial matter, we note the order to show cause issued by the trial court contained an apparently unintentional error.  After reciting the terms

of the temporary restraining order, it stated, "Further, Defendants shall show cause, if any exists, why a preliminary injunction should not issue pending trial, enjoining all Defendants from continuing to operate their respective businesses." Defendants, the State and County parties, do not operate businesses. However, the State and County parties did not object at the time, and their argument on appeal does not rest on this inadvertent deficiency. We therefore do not consider it further.

Viewing the proceedings more broadly, the notice that the State and County parties did receive cannot reasonably be construed to cover the expansive relief granted in the preliminary injunction, or the purported grounds therefor. The adult entertainment businesses' complaint and their application for a temporary restraining order focused entirely on the State and County restrictions on live entertainment. They did not challenge restaurant restrictions. In their application, they stated, "This application is made on the grounds that [the State and County parties] have, together, effectuated for all practical purposes [a] complete ban on live performances by adult entertainers in violation of Plaintiffs' constitutionally protected civil rights, including the right to freedom of speech, equal protection, and due process." They repeatedly stated that the issue was live entertainment: "At issue here is the right of Plaintiffs to allow for live adult entertainment at their venues. Such live entertainment is protected by the First Amendment as expressive conduct." They explicitly described their requested relief as follows: "Plaintiffs seek no more than to allow these socially distanced adult performances in their venues that are currently only allowed to operate as restaurants at 25% capacity." They repeated the same arguments at the hearing on their application for a temporary restraining order: "The issue that is before the [c]ourt is a total ban on live adult entertainment."

25

The temporary restraining order issued by the court was likewise limited to live entertainment. It enjoined the State and County parties "from enforcing the provisions [of] the cease and desist orders, or any other related orders, that prevent Plaintiffs from being allowed *to provide live adult entertainment*, subject to the least restrictive means to further Defendants' response to control the spread of COVID." (Italics added.)

In their supplemental brief in support of a preliminary injunction, the adult entertainment businesses did not deviate from their singular focus on live entertainment. They characterized the challenged restrictions as an "outright ban of Plaintiffs' fundamental First Amendment rights" and argued they were invalid as either content-based or content-neutral regulations. Their expert likewise opined on whether live entertainment *increased* the risk of COVID-19 transmission at restaurants. He did not address the risk of transmission in restaurants more broadly. He stated, "I have been asked to opine on the issue of whether a restaurant would *increase* the risk to its patrons or employees if a dancer performing on a stage were present if the dancer is 15 feet away from all patrons and suitably masked." (Italics added.)

On reply, the adult entertainment businesses continued to frame the issue around live entertainment. They explained, "The challenge here relates to Defendants' emergency orders that prohibit live adult entertainment" and "Plaintiffs brought this case to protect their freedom of expression." They asserted, "Plaintiffs are entitled to a definitive order from the Court that makes allowances for the continuance of live adult entertainment." They mentioned the newly enacted Regional Stay at Home Order, but only in relation to live performances, e.g., "Under the newly minted 'Deep Purple' tier Plaintiffs are back to a total ban on all live adult entertainment . . . ."

26

A reasonable person would not understand that restaurant restrictions would be at issue in these proceedings. Throughout their briefing, the adult entertainment businesses never challenged restaurant restrictions and never articulated any basis for such a challenge. Indeed, the explicit premise of their argument was that *restaurants were allowed to operate*, and live entertainment did not increase the risk of COVID-19 transmission at restaurants. They said so explicitly: "Plaintiffs seek no more than to allow these socially distanced adult performances in their venues that are currently only allowed to operate as restaurants at 25% capacity."

Because the State and County parties had no notice that restaurant restrictions were at issue, the court violated due process by considering them for the first time in its order and, without any opportunity for comment, enjoining their enforcement, effective immediately. "Due process of law does not mean according to the whim, caprice, or will of a judge, [citation]; it means according to law." (*Estate of Buchman* (1954) 123 Cal.App.2d 546, 560.) "Judicial absolutism is not a part of the American way of life. The odious doctrine that the end justifies the means does not prevail in our system for the administration of justice. The power vested in a judge is to hear and determine, not to determine without hearing. When the Constitution requires a hearing, it requires a fair one, one before a tribunal which meets established standards of procedure." (*Ibid.*)

To justify the injunction, the adult entertainment businesses argue first that the State and County parties "invited the trial court to address the constitutionality of the restrictions on restaurants" because they characterized the businesses as "restaurants" for purposes of public health restrictions. This argument is unpersuasive. The characterization of the adult entertainment businesses as restaurants was relevant to the issue

27

presented—whether live entertainment was allowed—in a narrow sense, because it was the reason for the restrictions on live entertainment. This characterization did not put at issue either the broader restrictions on restaurants generally, or the nuances of whether outdoor dining versus indoor dining is permissible specifically, because these restrictions on restaurants (separate from live entertainment) were never challenged. As discussed above, the premise of the adult entertainment businesses' argument (and the State and County parties' opposition) was that restaurants were allowed to operate. It was the restriction on live entertainment that was disputed.

As part of this argument, the adult entertainment businesses point to the State and County parties' request, during the preliminary injunction hearing, that the court take judicial notice of an order denying a temporary restraining order in litigation pending before a different judge in the trial court. (See *640 Tenth, LP v. Newsom* (Super. Ct. San Diego County, No. 37-2020-00041316-CU-MC-CTL) (*640 Tenth*).) The trial court granted the request for judicial notice, and we take judicial notice of the order as well. (Evid. Code, §§ 452, subd. (d), 459.) Our judicial notice is expressly limited to the existence and content of the order, but not the truth of any factual assertions or findings. (See *Steed v. Dept. of Consumer Affairs* (2012) 204 Cal.App.4th 112, 122.) The parties dispute whether the trial court exceeded the limits of judicial notice in its reliance on the order, but we need not consider the issue to resolve this appeal.

The *640 Tenth* litigation was brought by several San Diego restaurants and gyms. They alleged that public health restrictions imposed by the Governor and state agencies exceeded their statutory authority or invaded the role of the Legislature. The *640 Tenth* court found that the restaurants

28

and gyms had not shown a probability of prevailing and the balance of the harms did not favor them.

At the preliminary injunction hearing in this matter, the State argued that the *640 Tenth* order was relevant to show that other businesses in San Diego County were following public health restrictions, but the temporary restraining order gave the adult entertainment businesses special dispensation to operate (improperly, in the State's view). The State went on to argue that it was relevant "to the factual context here" but that the trial court was not bound by an order in another case.

While the trial court took judicial notice of the *640 Tenth* order, neither this fact nor the State's comments indicated that restaurant restrictions were suddenly at issue in the proceedings below. Nor, in our view, could it have expanded the adult entertainment businesses' claims in this manner under the circumstances here. The adult entertainment businesses' requested relief, and its legal basis, remained the same. The *640 Tenth* order was addressed in passing and did not play any significant role at the hearing.[3]

The adult entertainment businesses also point to the well-settled rule that a trial court has "broad discretion to allow amendments to pleadings to

---

[3] The *640 Tenth* plaintiffs are among the parties who have filed an amicus curiae brief in this appeal. Their brief seeks, in large part, to litigate the issue of restaurant restrictions that was not litigated in the trial court below. It is supported by a voluminous request for "judicial notice" of various facts and evidence surrounding the issue. The scope of this request for judicial notice—covering documents not presented to the trial court—only confirms that the issue was not litigated below and the trial court's injunction covering restaurant restrictions was improper. We decline the *640 Tenth* plaintiffs' invitation to litigate the issue of restaurant restrictions for the first time in this appeal. By separate order, we have denied their request for judicial notice. We express no opinion on the merits of the substantive arguments they seek to present.

29

harmonize any variance between a party's allegations and the proof submitted in support." Here, however, the adult entertainment businesses did not seek to amend their complaint or alter the relief requested. Nor did the "proof" in the proceedings below encompass a challenge to restaurant restrictions. This rule therefore is inapplicable and does not provide any basis for upholding the trial court's preliminary injunction.

The adult entertainment businesses also point out that courts have the authority to issue injunctions, in the public interest, that sweep more broadly than the specific parties before it. (See, e.g., *City of Chicago v. Barr* (7th Cir. 2020) 961 F.3d 882, 918.) We need not consider whether the trial court could extend its injunction to other businesses offering restaurant service, if restaurant restrictions had been properly at issue. The error here is more fundamental. The trial court did not have the ability, consistent with principles of due process, to enjoin restaurant restrictions at all, even in favor of the two adult entertainment businesses in this case.

The adult entertainment businesses rely on *People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266 and *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, but they are inapplicable. *Uber Technologies* affirmed an allegedly overbroad injunction, noting that it was *consistent* with the alleged violations. (*Uber Technologies*, at p. 317.) The injunction here was not consistent with the violation alleged (or the relief sought) by the adult entertainment businesses. *City of Redlands* considered a writ of mandate issued following trial. (*City of Redlands*, at p. 405.) The defendant contended that the language of the writ, which covered the offending general plan amendment " 'or any similar amendment(s),' " was overbroad because it extended beyond the scope of the litigation. (*Id.* at p. 415.) *City of Redlands* agreed "that an injunctive order should be limited

in scope to the subject of the litigation" but disagreed that the writ was overbroad. (*Ibid*.) It explained that the trial court "reasonably included this additional requirement to prevent the County from attempting technical compliance with the court's order (i.e., by simply enacting new amendments with similar language), without remedying the deficiencies raised in this action . . . ." (*Ibid*.) The injunction here did not simply extend to other conduct similar to the live entertainment restrictions. It invalidated separate and distinct restrictions on restaurants, unrelated to live entertainment, that were never the subject of the proceedings below.

It is apparent that even the adult entertainment businesses do not seriously contend that the propriety of restaurant restrictions was actually litigated below. Our review of the record, detailed above, confirms this conclusion. The trial court therefore violated due process by enjoining the State and County parties from enforcing restaurant restrictions, and that portion of the preliminary injunction must be reversed.[4]

---

[4]     The adult entertainment businesses note that the County parties, in their appellate briefing, state that they do not object to "that portion of the trial court's order that enjoins restrictions against *outdoor* dining." (Italics added.) The businesses claim this position "effectively concedes the trial court's authority to include restaurants in the injunction." Whether the County's position constitutes a concession or not, it is not dispositive. The State parties object to the injunction in its entirety, and as discussed it is improper. In this context, the County parties request that we take judicial notice of two filings by the State parties in a federal appeal. These filings appear to be relevant, if at all, for the truth of the matters stated therein. The truth of these matters is not judicially noticeable, so we deny the County parties' request for judicial notice of the filings. (See *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.) The County parties also request that we take judicial notice of the County's most recent public health order. The adult entertainment businesses do not oppose this request. We therefore grant judicial notice of this public health order. (Evid. Code, §§ 452, subd. (c), 459.)

# III

## *Restrictions on Live Performances*

### A

The State and County parties contend the court abused its discretion by enjoining their enforcement of restrictions on live entertainment, specifically, because the adult entertainment businesses have not shown a likelihood of prevailing on their claims. Because the injunction prohibits the enforcement of any orders, our focus is the current set of public health restrictions governing the adult entertainment businesses, i.e., the August 2020 Blueprint for a Safer Economy (with updated November 2020 restaurant guidance) and the December 2020 Regional Stay at Home Order. We conclude the trial court erred by finding that the businesses had shown a likelihood of succeeding on their claim that these restrictions are unconstitutional.[5]

The adult entertainment businesses' primary claim is based on the First Amendment. "Nude or semi-nude entertainment is expressive activity that falls within the ambit of the First Amendment. [Citations.] However, 'nude dancing . . . falls only within the outer ambit of the First Amendment's protection.' " (*Krontz v. City of San Diego* (2006) 136 Cal.App.4th 1126, 1132

---

[5] We note that the adult entertainment businesses' challenge to the prior regulatory scheme, before the updated restaurant guidance, is not necessarily moot. (See *Roman Catholic Diocese v. Cuomo* (2020) __ U.S. __ [141 S.Ct. 63, 68] [2020 WL 6948354, at *6] (*Roman Catholic Diocese*).) The injunction here, however, was not limited to the prior scheme, and the adult entertainment businesses have given no indication they seek such a limited injunction, which would have no effect on enforcement of the current Blueprint for a Safer Economy or the Regional Stay at Home Order. We therefore need not consider whether the restriction on live entertainment, before the updated restaurant guidance, was valid under the First Amendment or otherwise.

(*Krontz*); accord, *City of Erie v. Pap's A.M.* (2000) 529 U.S. 277, 289 (*City of Erie*).) "The specific First Amendment tests that may apply, and the determination as to the proper level of scrutiny, depends for the most part on the nature of the provision" challenged as unconstitutional. (*Dream Palace v. County of Maricopa* (9th Cir. 2004) 384 F.3d 990, 998 (*Dream Palace*).)

B

The most stringent restriction currently imposed on the adult entertainment businesses is the Regional Stay at Home Order. The Regional Stay at Home Order generally prohibits gatherings among members of different households, with some exceptions. It allows worship and political expression outdoors, with safety protocols. It allows "critical infrastructure retailers" to operate indoors at 20 percent capacity, again with safety protocols. As relevant here, it limits restaurants to take-out and delivery service. They cannot have indoor or outdoor dining.

We must first consider whether the Regional Stay at Home Order implicates the First Amendment at all. The adult entertainment businesses bear this initial burden. (*Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 293, fn. 5 (*Clark*).)

In *Arcara v. Cloud Books, Inc.* (1986) 478 U.S. 697 (*Arcara*), the United States Supreme Court considered an analogous situation. Local law enforcement witnessed illegal sexual activities taking place at an adult bookstore. (*Id.* at p. 698.) The government filed a civil suit seeking closure of the bookstore under generally applicable laws identifying "places of prostitution, lewdness, and assignation as public health nuisances[.]" (*Id.* at p. 699.) The trial court rejected the bookstore's defense based on the First Amendment. (*Id.* at p. 700.)

33

The Supreme Court agreed the First Amendment did not apply. (*Arcara, supra,* 478 U.S. at p. 707.) It explained, "[W]e have not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in [*United States v. O'Brien* (1968) 391 U.S. 367 (*O'Brien*)], or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in [*Minneapolis Star & Tribune Co. v. Minnesota Comm. of Revenue* (1983) 460 U.S. 575]. This case involves neither situation, and we conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." (*Arcara*, at pp. 706-707.)

Here, as in *Arcara*, a generally-applicable public health regulation has curtailed expressive activity. Under *Arcara*, the First Amendment will apply if "it was conduct with a significant expressive element that drew the legal remedy in the first place" or if the restriction "has the inevitable effect of singling out those engaged in expressive activity." (*Arcara, supra,* 478 U.S. at pp. 706-707.) We conclude neither circumstance applies here. The Regional Stay at Home Order is an all-encompassing set of restrictions on public and private gatherings, prompted by the threat of COVID-19 transmission at such gatherings. There has been no showing that conduct with a significant expressive element, let alone live nude adult entertainment, drew the restrictions in the first place. Similarly, the breadth of the Regional Stay at Home Order shows that singling out expressive

34

activity is not an inevitable effect of its application. It does not implicate the First Amendment. (See *Mitchell v. Newsom* (C.D.Cal. 2020) __ F.Supp.3d __ [2020 WL 7647741, at *4].)

The adult entertainment businesses first argue that the State and County parties have forfeited reliance on *Arcara* by not advancing this argument in the trial court. We disagree. The Regional Stay at Home Order was not in effect in the County when the State parties filed their supplemental brief opposing the issuance of a preliminary injunction—nor was it in effect when the adult entertainment businesses sought their temporary restraining order and order to show cause for a preliminary injunction. To the extent the Regional Stay at Home Order was part of the preliminary injunction and is part of this appeal, the State parties' counterarguments are likewise a part. In any event, even if the forfeiture rule applies, we exercise our discretion to consider the State and County parties' position.

On the substance, the adult entertainment businesses do not address *Arcara*, except to say it is inapplicable—without further explanation. Instead, they rely on *Roberts v. Neace* (6th Cir. 2020) 958 F.3d 409 (*Roberts*). *Roberts* considered a constitutional challenge to COVID-19 prohibitions on in-person worship, based on the First Amendment right to free exercise of religion. (*Id.* at p. 413.) In this context, "a generally applicable law that incidentally burdens religious practices usually will be upheld," but "a law that discriminates against religious practices usually will be invalidated[.]" (*Ibid.*) *Roberts* held that the prohibition on in-person worship discriminated against religion because similar gatherings were allowed under various exceptions to generally-applicable rules. (*Ibid.*)

35

The adult entertainment businesses claim that various exceptions to the Regional Stay at Home Order similarly render it discriminatory. Even accepting the analogy to *Roberts* for the sake of argument, we disagree. The exceptions identified by the adult entertainment businesses, such as retail stores, shopping malls, outdoor religious services, and outdoor political protests, are not similar to the adult entertainment businesses because the adult entertainment businesses incorporate restaurant service. It is restaurants that are regulated by the Regional Stay at Home Order, not any expressive activity protected under the First Amendment. The evidence shows that restaurants and bars are high risk environments for COVID-19 transmission because, among other things, eating and drinking requires the removal of face coverings. Moreover, restricting all restaurants to take-out and delivery only does not implicitly discriminate against the adult entertainment businesses. They are simply covered under a generally-applicable rule. To frame it under the correct standard, neither the Regional Stay at Home Order nor its restaurant restrictions singles out live adult entertainment (or adult entertainment businesses) in its application. (See *Arcara*, *supra*, 478 U.S. at p. 707.)

The adult entertainment businesses rely heavily on the exceptions in the Regional Stay at Home Order for outdoor religious services and outdoor political protests. They argue that these exceptions show that the restrictions on their own businesses are content-based regulations, i.e., non-religious and non-political speech is disfavored. This argument is unpersuasive. First, the adult entertainment businesses seek to engage in expressive *conduct*, not simply speech, and the speech-based authorities cited by the businesses are therefore inapplicable. (See, e.g., *Reed v. Town of Gilbert* (2015) 576 U.S. 155, 156.) Second, as noted, the basis for the

36

Regional Stay at Home Order's restrictions on the adult entertainment businesses is their restaurant operations, not their live entertainment. We have no occasion in this appeal to consider which restrictions would apply to a business offering only live entertainment, not restaurant service, and to what extent those restrictions would be constitutional.

The adult entertainment businesses rely on *Roman Catholic Diocese, supra*, __ U.S. __ [141 S.Ct. 63] and the related opinion on remand in *Agudath Israel of America v. Cuomo* (2d Cir. 2020) 983 F.3d 620 [2020 WL 7691715], but they are wholly inapplicable. Those cases, like *Roberts*, considered a First Amendment challenge to COVID-19 restrictions based on the right to free exercise of religion. The restrictions in *Roman Catholic Diocese* and *Agudath Israel* explicitly targeted religious exercise, limiting religious services to a maximum occupancy of 10 or 25 persons. (*Roman Catholic Diocese*, at p. 66; *Agudath Israel*, at *6.) They "single out houses of worship for especially harsh treatment." (*Roman Catholic Diocese*, at p. 66, fn. omitted; see *Agudath Israel*, at *7.) By contrast, the restrictions on the adult entertainment businesses do not single out expressive activity. They apply to all restaurants.

Because the Regional Stay at Home Order's restrictions on the adult entertainment businesses do not implicate the First Amendment, they are subject to rational basis review. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (*F.C.C. v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313.) "Where there are 'plausible reasons' for [the restriction], 'our inquiry is at an end.' [Citation.] This

standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " (*Id*. at pp. 313-314.)

The parties address rational basis review in their briefing, but it was never litigated in the trial court. The adult entertainment businesses did not contend that rational basis review applied to their claims, and the State and County parties did not oppose on that basis. We will not consider the issue for the first time on appeal. Although we note the exceedingly low standard necessary to satisfy rational basis review, we express no opinion on the parties' other specific legal and factual contentions.[6]

C

The adult entertainment businesses also remain subject to the color-tier-based Blueprint for a Safer Economy, which will govern their operations when regional ICU capacity recovers and the Regional Stay at Home Order is no longer in effect. Under the Blueprint for a Safer Economy, with its updated restaurant guidance, the adult entertainment businesses are allowed to offer live entertainment to the same extent they are allowed to operate as restaurants. This circumstance is what the adult entertainment businesses sought by their request for provisional relief: "Plaintiffs seek no more than to allow these socially distanced adult performances in their

---

[6] We are able to address the discrete legal issue of what standard of review applies to the challenged restrictions in the Regional Stay at Home Order, and conclude rational basis review applies for the reasons stated. However, resolving the question of whether these specific restrictions survive rational basis review is a separate issue entirely and should be litigated in the trial court in the first instance.

venues that are currently only allowed to operate as restaurants at 25% capacity."

The State parties note it is unclear whether the trial court found that the Blueprint for a Safer Economy, with updated restaurant guidance, violates the First Amendment. We note it is likewise unclear whether the adult entertainment businesses make such a contention. To the extent they do, we reject their argument as unpersuasive.

Again, the specific First Amendment test that applies to the updated guidance depends on the nature of the restriction. (*Dream Palace*, *supra*, 384 F.3d at p. 998.) "To determine what level of scrutiny applies to the ordinance at issue here, we must decide 'whether the State's regulation is related to the suppression of expression.' [Citation.] If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the 'less stringent' standard from *O'Brien* for evaluating restrictions on symbolic speech. [Citations.] If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard." (*City of Erie*, *supra*, 529 U.S. at p. 289.)

The government purpose here is unrelated to the suppression of expression. It is undisputed that the Blueprint for a Safer Economy was created to prevent the spread of COVID-19. The restrictions on indoor and outdoor restaurant operations, and associated capacity limits, are designed to promote physical and social distancing and reduce the risk of virus transmission at restaurants. Any suppression of expression is incidental to its purpose. The less stringent *O'Brien* test therefore applies. (*City of Erie*, *supra*, 529 U.S. at p. 296.)

Under *O'Brien*, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*O'Brien*, *supra*, 391 U.S. at p. 377; accord, *Krontz*, *supra*, 136 Cal.App.4th at p. 1137.)

The adult entertainment businesses conceded in the trial court that the first two factors of the *O'Brien* test are satisfied. In this court, they agree the State and County parties "have a compelling interest in protecting the public from COVID-19." As to the third factor, we have already noted that this interest is unrelated to the suppression of expression.

The fourth *O'Brien* factor requires that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*O'Brien*, *supra*, 391 U.S. at p. 377.) This factor does not require a showing that "there are less speech-restrictive alternatives that could have satisfied" the government's interest in regulation. (*Clark*, *supra*, 468 U.S. at p. 299.) Nor must the regulation "be the least restrictive or least intrusive means of doing so." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 798 (*Ward*); accord, *City of Erie*, *supra*, 529 U.S. at pp. 301-302 ["least restrictive means analysis is not required"].) "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' [Citation.] To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a

substantial portion of the burden on speech does not serve to advance its goals. [Citation.] So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (*Ward*, at pp. 799-800, fns. omitted.)[7]

The fourth *O'Brien* factor is satisfied here. As noted, restaurants and bars are high risk environments for COVID-19 transmission because, among other things, eating and drinking requires the removal of face coverings. The government therefore has an interest in restricting restaurant operations to reduce the spread of COVID-19. The restaurant restrictions themselves do not implicate the First Amendment. The First Amendment is only implicated, if at all, by the restriction on live entertainment at restaurants. But the restriction on live entertainment at restaurants is no greater than the restriction on restaurants themselves. It therefore does not burden any more expression than necessary to further the government's interest. Indeed, it is clear that the government's important interest in limiting COVID-19 transmission at restaurants would be achieved less effectively if a restaurant could exempt itself from the restrictions by offering live entertainment. The live entertainment restrictions do not run afoul of the First Amendment.

---

7    Although *Ward* involved a time, place, and manner restriction on speech, rather than a restriction on expressive conduct, the U.S. Supreme Court has emphasized that the test for expressive conduct should not be more restrictive than the test for time, place, and manner restrictions on speech. (*Clark, supra*, 468 U.S. at p. 298, fn. 8.) *Ward*'s discussion therefore informs our analysis. (See, e.g., *Krontz, supra*, 136 Cal.App.4th at p. 1138 [applying *O'Brien* and *Ward*].) The adult entertainment businesses' briefing shows that it is expressive conduct, not speech, that is at issue here: "The entire point of *live* adult entertainment is that it is performed *live*."

In their briefing, the adult entertainment businesses assert "there is *no evidence at all* that allowing live adult entertainment establishments to operate in some fashion, even outdoors under the protocols plaintiffs developed, would have any effect on the spread of COVID-19." The adult entertainment businesses are incorrect. The State's epidemiology and infectious disease expert explained that the virus's most common mode of transmission is person-to-person, "through respiratory particles such as those that are produced when an infected person coughs or sneezes or projects his or her voice through speaking, singing, and other vocalization." Therefore, interacting with individuals outside the home, and especially gathering with individuals from other households, increases the risk of transmission. The expert addressed restaurants specifically: "Restaurants and bars are considered high risk environments for transmission because they are settings where people from different households share the same space for prolonged periods of time. Further, eating and drinking require removal of face coverings which can increase the spread of infectious particles. Additionally, physical movement within the establishment, duration of time spent in the establishment, and the degree of social mixing among individuals and groups outside one's household may all be significant in these sectors, which substantially elevates the risk of transmission even where face coverings can be worn."

The adult entertainment businesses criticize the State's expert for not addressing whether live entertainment, specifically, poses any risk. But the businesses offer live adult entertainment and restaurant service. The risk posed by restaurants is therefore relevant. We need not, and do not, address the risks posed by live entertainment without restaurant service.

42

The adult entertainment businesses also maintain that no COVID-19 cases have been traced back to their operations. This fact is not dispositive. It is the risk of COVID-19 transmission that prompted the restrictions on the adult entertainment businesses. The State and County need not wait until an outbreak has actually occurred at a specific business location. As one court recently explained, in upholding the Regional Stay at Home Order's restrictions on houses of worship, "In general, a local government is not required to prove that a particular individual has contributed to a known social harm, before implementing a law that seeks to prevent the harm. Just as a restaurant with no known COVID-19 cases tied to it is bound by a valid public health regulation, so must a house of worship that has no known COVID-19 cases tied to it. This is especially so when the social harm sought to be mitigated is community spread of a deadly virus, whose exact path of contagion is hard to trace." (*South Bay United Pentecostal Church v. Newsom* (S.D.Cal. 2020) __ F.Supp.3d __ [2020 WL 7488974, at *12].)

*O'Brien* does not require us to consider whether the challenged regulation leaves open ample alternative channels of communication. (*O'Brien*, *supra*, 391 U.S. at p. 377.) That factor appears in the context of a First Amendment challenge to a time, place, and manner restriction on speech. (See, e.g., *Ward*, *supra*, 491 U.S. at p. 803.) But assuming without deciding that it is relevant here, we conclude the challenged regulation passes muster. The Blueprint for a Safer Economy allows live entertainment at restaurants in every tier. It merely imposes capacity and venue restrictions. Live entertainment is also allowed outside of restaurants. Thus, there is "ample capacity to convey the dancer's erotic message." (*City of Erie, supra*, 529 U.S. at p. 301.)

43

D

In sum, the Blueprint for a Safer Economy is a valid regulation of expressive conduct under *O'Brien* and *City of Erie*, and the Regional Stay at Home Order does not implicate the First Amendment at all under *Acara*. The adult entertainment businesses did not make the required showing that there was some possibility they would prevail on their claims. A preliminary injunction was therefore unwarranted.

"A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff will ultimately prevail on the merits of the claim. [Citation.] 'Where there is . . . no likelihood that the plaintiff will prevail, an injunction favoring the plaintiff serves no valid purpose and can only *cause* needless harm.' " (*Aiuto v. City & County of San Francisco* (2011) 201 Cal.App.4th 1347, 1361.) The court abused its discretion by issuing the injunction.[8]

---

[8] The adult entertainment businesses attempt to justify the preliminary injunction based on their equal protection and due process claims. Although they mentioned these concepts below, they were largely derivative of their First Amendment claims. They primarily differed only in the claim of selective enforcement, which the trial court rejected. To the extent these claims were presented to the trial court below, they are unpersuasive. The due process claims fail because the public health regulations are generally applicable. (See *Halverson v. Skagit County* (9th Cir. 1994) 42 F.3d 1257, 1261.) The equal protection claims fail because they are coextensive with the First Amendment claims. (See *Dariano v. Morgan Hill Unified School Dist.* (9th Cir. 2014) 767 F.3d 764, 780.) The adult entertainment businesses' "class of one" equal protection theory was not presented to the trial court, and we will not consider it for the first time on appeal.

44

IV

*Vagueness*

The County parties additionally contend that the preliminary injunction is invalid because it is unreasonably vague. "An injunction must be narrowly drawn to give the party enjoined reasonable notice of what conduct is prohibited." (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 979.) It "must be sufficiently precise to provide a person of ordinary intelligence fair notice that her contemplated conduct is forbidden." (*In re Marriage of Hartmann* (2010) 185 Cal.App.4th 1247, 1250.)

The injunction here prohibits the enforcement of any public health order that would prevent the adult entertainment businesses from providing live entertainment or restaurants from continuing to operate, "subject to protocols that are no greater than is essential to further Defendants' response to control the spread of COVID." The injunction does not identify which "essential" protocols remain enforceable, and it provides little guidance to the State and County parties going forward. It does not address physical distancing, capacity limits, indoor and outdoor operation, opening and closing times, self-service and table service, mask requirements, physical barriers, safety and training plans, cleaning protocols, and ventilation requirements, among many other areas that are regulated by public health authorities. It is unreasonably vague.

The adult entertainment businesses respond only that "[t]he order is not vague, as defendants contend, but clearly enjoins defendants from enforcing the restrictions prohibiting outdoor operations and limiting plaintiffs' and other restaurant businesses to take-out and delivery." They do not provide any basis for their assertion that the injunction is limited in this manner. The injunction prevents enforcement of all but "essential"

45

restrictions. And, in any event, even this gloss on the injunction is unclear. Can the State and County parties, for example, enforce a prohibition on indoor dining at restaurants? What about capacity restrictions, whether indoors or outdoors? It would turn on whether such restrictions were "essential," but neither the injunction itself nor the adult entertainment businesses' interpretation resolves the issue.

The injunction does not give reasonable notice to the State and County parties of the conduct that it prohibits. It is therefore invalid and must be reversed for this reason as well.[9]

## DISPOSITION

The order granting a preliminary injunction is reversed. On remand, the trial court is directed to enter an order denying the adult entertainment businesses' request for a preliminary injunction pending trial. The adult entertainment businesses may seek to amend their claims to address restaurant restrictions. We express no opinion on the propriety of any such

---

[9]    In light of our conclusion that the injunction must be reversed, we need not consider the County parties' contention that they are not the proper parties to be enjoined.

amendment or the substantive issues involved.  The State and County parties are entitled to their costs on appeal.


GUERRERO, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.